**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PHARMAESSENTIA USA CORP.,
35 Corporate Drive, Suite 325
Burlington, MA 01803,

    *Plaintiff*,

 v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201;

CENTERS FOR MEDICARE AND
MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244;

XAVIER BECERRA, in his official capacity
as Secretary of the United States Department
of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue, S.W.,
Washington, D.C., 20201; and

CHIQUITA BROOKS-LASURE, in her
official capacity as Administrator, Centers for
Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244,

    *Defendants*.

Case No. 24-CV-3346

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## PRELIMINARY STATEMENT

1.     This case concerns the Centers for Medicare and Medicaid Services' ("CMS") unlawful reliance on flawed, incomplete Prescription Drug Event ("PDE") data to erroneously determine that PharmaEssentia USA Corporation ("PharmaEssentia") does not qualify for a gradual phase-in of manufacturer discounts under the new Medicare Part D Manufacturer Discount Program.

2.     Medicare Part D provides coverage to Medicare beneficiaries for prescription drugs.  Medicare beneficiaries, however, remain financially responsible for a significant portion of those drugs' costs.  Beginning in 2025, Congress has redesigned Medicare Part D to reallocate much of the costs of drugs previously paid by beneficiaries, onto manufacturers, who must offer significant discounts on their drugs to Medicare Part D purchasers beginning in 2025.

3.     As part of Congress's chosen statutory balance to minimize drug costs to those manufacturers that can least afford to contribute to them, Congress created the statutory category of a "Specified Small Manufacturer," and allowed such manufacturers to gradually "phase-in" these mandatory discounts over several years, rather than paying the discounts beginning all at once in 2025.

4.     A "Specified Small Manufacturer" is a manufacturer whose total costs imposed on the Medicare Part D prescription drug program are highly concentrated in a single drug—which suggests that the manufacturer is a relatively small one.  Specifically, a Specified Small Manufacturer must satisfy a requirement that "total expenditures under Part D" for a single drug of that manufacturer accounted for at least "80 percent of the total expenditures" under Medicare Part D for all of the manufacturer's drugs dispensed in 2021.  42 U.S.C. § 1395w-114c(g)(4). "Total expenditures" is defined to include "total gross covered prescription drug costs," *id.*, *i.e.*, "with respect to a part D eligible individual enrolled in a prescription drug plan or MA–PD plan

during a coverage year, the costs incurred under the plan, not including administrative costs, but including costs directly related to the dispensing of covered part D drugs during the year and costs relating to the deductible," 42 U.S.C. § 1395w-115(b)(3).

5.    Putting this all together, then, to identify a "Specified Small Manufacturer," CMS must examine whether the total "costs" of a manufacturer's drugs to Part D plans are highly concentrated in a single drug. *Id.*

6.    The key question in this case is what is the best reading of the statutory term "costs." Specifically, does the term "costs" refer to *actual costs* incurred by Medicare Part D plans related to the dispensing of covered part D drugs, as PharmaEssentia contends and as specified in 42 U.S.C. § 1395w-115(b)(3)?  Or does the term "costs" refer only to "costs" identified in a CMS-selected dataset, known as the PDE dataset, that is not mentioned anywhere in the statute?

7.    The best reading of the statute is straightforward:  The statutory term "costs" refers to actual costs incurred by Medicare Part D plans related to the dispensing of covered part D drugs, and is not limited to the narrower subset of these costs reported in the CMS-selected PDE dataset.

8.    The PDE dataset that CMS has identified as the sole permissible source of information about drug costs consists of third-party data—not data generated by either PharmaEssentia or by CMS.  CMS instead compiles the PDE dataset from information provided by third-party Medicare Part D plans.

9.    In theory, Medicare Part D plans are supposed to report to CMS costs they incur when prescription drugs are dispensed.  But in reality, and as CMS has acknowledged, there are many instances where Part D plans submit incorrect or incomplete PDE data to CMS (or do not submit PDE data at all).  As a result, the PDE dataset is notoriously error-prone and incomplete, and as a result, fails to accurately reflect actual costs incurred by Medicare Part D plans.

10.     Notwithstanding these acknowledged deficiencies, CMS chose, without any public comment or input, to rely solely on this third-party data over which manufacturers have no control to make decisions of tremendous economic import to manufacturers, including PharmaEssentia.

11.     As explained above and detailed below, in making its determination regarding whether PharmaEssentia qualifies as a Specified Small Manufacturer as part of its phase-in eligibility process (the "Eligibility Decision"), CMS has simply read Congress's chosen statutory term "costs" incorrectly, by unlawfully narrowing the meaning of the statutory term "costs" to equate solely to PDE data.  CMS therefore refused to consider PharmaEssentia's record evidence showing the costs incurred by Medicare Part D plans for PharmaEssentia's sole drug in 2021.  As a result, CMS erroneously found that PharmaEssentia was ineligible for the gradual phase-in of discounts Congress provided for Specified Small Manufacturers like PharmaEssentia.

12.     Here is how CMS went astray:  The Inflation Reduction Act of 2022 ("IRA"), signed into law in August 2022, significantly redesigned the Medicare Part D benefit starting in 2025, to reallocate drug costs previously paid by beneficiaries, onto Medicare Part D plans and manufacturers.  Specifically, the IRA requires drug manufacturers that wish to have their drugs paid for under Medicare Part D to enroll in the new Medicare Part D Manufacturer Discount Program, beginning in 2025, and to agree to pay discounts of 10% on their drugs for Part D beneficiaries in the initial coverage phase and 20% in the catastrophic coverage phase.

13.     Congress enacted a carefully calibrated statutory scheme to shield Specified Small Manufacturers who could least bear the new, greater expenses of cost-sharing from bearing excessive burdens associated with the Part D redesign.

14.     For example, if a manufacturer qualifies for the Specified Small Manufacturer phase-in, the discount the manufacturer must provide is 1% in 2025 and 2% in 2026 under both

the initial phase and the catastrophic phase, as opposed to 10% for the initial phase and 20% for the catastrophic phase. The discounts then increase over a number of years, reaching 10% for the initial phase in 2029 and 20% for the catastrophic phase in 2031.

15.    PharmaEssentia is a biopharmaceutical company that launched its first and only U.S. product to date, BESREMi, in December 2021. BESREMi is an innovative and important drug to treat polycythemia vera, a rare blood cancer that causes the blood to thicken, which can lead to a host of health problems, including physical pain, stroke, and tissue and organ damage.

16.    It should be crystal clear that PharmaEssentia is a Specified Small Manufacturer: PharmaEssentia marketed only a single drug in the United States in 2021, and so, by definition, all of the Medicare Part D expenditures on PharmaEssentia's drugs in 2021 stem from that single drug—thereby easily reaching the 80% of total Part D expenditures threshold set forth in the IRA. 42 U.S.C. § 1395w-114c.

17.    Under the statute, the only question is whether PharmaEssentia had *any* sales of BESREMi that resulted in *any* costs to a Medicare Part D plan for dispenses that occurred in 2021. If so—if even <u>one dollar</u> of BESREMi Medicare Part D costs arose from 2021 dispenses— PharmaEssentia undisputedly would qualify as a Specified Small Manufacturer, because PharmaEssentia sells only one drug that Medicare Part D plans pay for. *See* 42 U.S.C. § 1395w-114c(g)(4).

18.    Because PharmaEssentia launched BESREMi in December 2021, the company's eligibility for the Specified Small Manufacturer phase-in hinges on just three weeks of sales at the very end of that benchmark year.

19.    Those sales were limited, in part because BESREMi is an orphan drug that treats a rare blood cancer—but those sales included three dispenses of the drug to Medicare Part D

beneficiaries, and those three dispenses were paid for by Medicare Part D plans.

20.     If *any one* dispense of BESREMi in 2021 was paid by a Medicare Part D plan, then PharmaEssentia qualified as a Specified Small Manufacturer according to the statute's plain language. *See* 42 U.S.C. § 1395w-114c(g)(4). Here, there was not just one, but three qualifying dispenses.

21.     For example, a pharmacy dispensed BESREMi to a Medicare Part D beneficiary on December 14, 2021, the claim for payment was submitted to the Medicare Part D plan on December 17, 2021, and the pharmacy received payment from the Medicare Part D plan on December 29, 2021.

22.     In addition, in December 2021, a pharmacy dispensed BESREMi to a Medicare Part D beneficiary two additional times, on December 23 and December 28, 2021, and the pharmacy received payment from the Medicare Part D plan on January 5, 2022.

23.     Consequently, it is clear that "total expenditures under Part D" for a single drug dispensed in 2021 accounted for at least 80% of PharmaEssentia's total Part D expenditures in 2021, and PharmaEssentia qualified as a Specified Small Manufacturer. 42 U.S.C. § 1395w-114c.

24.     PharmaEssentia timely submitted information requested by CMS for the agency to evaluate PharmaEssentia's phase-in eligibility as a Specified Small Manufacturer. In doing so, CMS does not offer manufacturers like PharmaEssentia the opportunity to provide their own cost data. That is because, when determining costs under the IRA's Medicare Part D Manufacturer Discount Program, CMS has chosen to rely exclusively on the PDE dataset.

25.     In theory, if CMS's PDE dataset systems were working as CMS intended, the PDE data should have contained records of each of the three December 2021 dispenses of BESREMi to Medicare Part D beneficiaries, and the resulting costs to the Medicare Part D drug plans.

26.     When CMS issued preliminary phase-in determinations, however, CMS unexpectedly found that PharmaEssentia was not eligible for the Specified Small Manufacturer phase-in, apparently because CMS's PDE data assembled by CMS from the Medicare Part D plans failed to accurately capture the December 2021 dispenses of BESREMi.

27.     PharmaEssentia promptly filed a request for CMS to correctly determine its eligibility as a Specified Small Manufacturer.  In tandem with that request, PharmaEssentia provided its own evidence to CMS that Medicare Part D plans paid for BESREMi dispenses that took place in 2021.

28.     However, in its June 4, 2024 Eligibility Decision, CMS rejected PharmaEssentia's request to determine its eligibility as a Specified Small Manufacturer, stating that CMS relied solely on PDE data submitted by third-party Part D plans to determine 2021 Part D expenditures for the manufacturers' phase-in calculations, and would not consider non-PDE data submitted by PharmaEssentia.

29.     PharmaEssentia subsequently sought reconsideration of CMS's Eligibility Decision, but CMS issued a written decision denying reconsideration on October 30, 2024 (the "Reconsideration Decision"), stating that because "there are no final action, non-delete PDEs with 2021 dates of service for any applicable drug under PharmaEssentia's FDA-assigned labeler code, CMS is making no change to the phase-in eligibility determination."

30.     Because CMS did not identify any costs associated with dispenses for BESREMi in 2021 in its PDE data, CMS concluded that PharmaEssentia had zero Part D expenditures in 2021, and PharmaEssentia therefore did not meet the 80% threshold for the Specified Small Manufacturer phase-in, despite BESREMi being PharmaEssentia's only drug.

31.     CMS's exclusive reliance on evidently incomplete PDE data to determine PharmaEssentia's phase-in eligibility, and CMS's disregard of the record evidence of three Medicare Part D payments for BESREMi 2021 dispenses, is contrary to law and arbitrary and capricious.

32.     Nowhere does the governing statute permit CMS to ignore record evidence of actual covered prescription drug costs, like the evidence of costs associated with the three 2021 dispenses of BESREMi to Medicare Part D beneficiaries that PharmaEssentia submitted to CMS.

33.     By categorically refusing to consider record evidence of Part D expenditures beyond PDE data, CMS violated the governing statute, which required CMS to consider evidence of "costs" incurred by Medicare Part D plans for BESREMi, not just "PDE data showing costs," as CMS erroneously determined here.  *See* 42 U.S.C. § 1395w-115(b)(3).

34.     CMS's refusal to designate PharmaEssentia as a Specified Small Manufacturer is also arbitrary and capricious.

35.     By refusing to consider the undisputed record evidence of the costs incurred by Medicare Part D plans for PharmaEssentia's drug, and instead blinkering itself to review only the PDE dataset, CMS failed to "base its decision[] on the entire record" of costs incurred to pay for BESREMi.  *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 885 (D.C. Cir. 2004).

36.     CMS also "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

37.     CMS chose to rely solely on PDE data submitted to CMS by third-party Part D plans, not by PharmaEssentia, despite knowing the PDE dataset to be flawed and incomplete.

38.     Instead of considering the well-known flaws with the PDE dataset and obvious alternatives (like allowing manufacturers to submit additional data beyond those found in the PDE

dataset), CMS unilaterally decided to rely solely on the PDE dataset, without soliciting public comments, which would have identified the problems in relying on this flawed third-party data. The upshot of CMS's chosen approach is that tens of millions of dollars in liability for PharmaEssentia to provide mandatory drug discounts hinges upon the happenstance of whether Medicare Part D plans accurately report, and CMS accurately records, the actual costs incurred to dispense a drug—actions that are totally beyond a manufacturer like PharmaEssentia's control.

39.     CMS's flawed approach imposes tens of millions of dollars in costs (mandatory discounts) on PharmaEssentia, and therefore defeats Congress's intent in providing the gradual phase-in option:  To give Specified Small Manufacturers like PharmaEssentia time to adjust to the new discount obligations without jeopardizing their finances and their drugs' viability.

40.     PharmaEssentia therefore brings this action to set aside and vacate CMS's unlawful Specified Small Manufacturer phase-in Eligibility Decision and Reconsideration Decision refusing to recognize that PharmaEssentia is a Specified Small Manufacturer.  The Court should set aside CMS's refusal to recognize PharmaEssentia's Specified Small Manufacturer status, and order CMS to reevaluate PharmaEssentia's eligibility for the Specified Small Manufacturer phase-in, taking into account all available Part D cost information for BESREMi, including the Part D cost information provided by PharmaEssentia.

## PARTIES

41.     Plaintiff PharmaEssentia is a pharmaceutical company that owns and manufactures one drug product, BESREMi.  PharmaEssentia is a Delaware corporation with its principal place of business located at 35 Corporate Drive, Suite 325, Burlington, MA 01803.

42.     Xavier Becerra is the Secretary of Health and Human Services and the head of the United States Department of Health and Human Services ("HHS").  In this capacity, Secretary

Becerra has ultimate responsibility for activities at HHS, including the actions complained of herein.  His governmental activities occur nationwide.

43.    HHS is a department of the United States.  Its headquarters and principal place of business are at 200 Independence Avenue, SW, Washington, DC 20201.  Its governmental activities occur nationwide.

44.    Chiquita Brooks-LaSure is the Administrator of the Centers for Medicare and Medicaid Services ("CMS").  Her governmental activities occur nationwide.

45.    CMS is an agency of the United States and a division of HHS.  CMS's headquarters and principal place of business are at 7500 Security Boulevard, Baltimore, MD 21244.  Its governmental activities occur nationwide.

## JURISDICTION, VENUE, EXHAUSTION, AND FINALITY

46.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06.

47.    PharmaEssentia's prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1361.

48.    Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Defendant is an officer or agency of the United States and resides in this District.

49.    There is no statutory or regulatory requirement for exhaustion of administrative remedies, but PharmaEssentia has nonetheless pursued all conceivable administrative remedies.  Specifically, PharmaEssentia timely submitted all information requested by CMS under program guidance in support of its classification as a Specified Small Manufacturer.  On April 4, 2024, CMS notified PharmaEssentia that CMS had initially determined PharmaEssentia to qualify for one of the two phase-in options, but not as a Specified Small Manufacturer, and that

PharmaEssentia could request a recalculation within 30 days.  CMS further stated that, absent a timely request for recalculation within 30 days, CMS's initial notification would become CMS's final decision on the matter.  PharmaEssentia timely submitted a request for recalculation to CMS on April 30, 2024, submitting evidence concerning drug dispensing costs supporting PharmaEssentia's eligibility as a Specified Small Manufacturer.  Ex. 5, April 30, 2024 PharmaEssentia Phase-In Eligibility Recalculation Request Email; Ex. 6, April 30, 2024 PharmaEssentia Recalculation Request Letter.  On June 4, 2024 CMS issued its Eligibility Decision notifying PharmaEssentia that CMS had finally determined that PharmaEssentia is not a Specified Small Manufacturer.  Ex. 7, June 4, 2024 CMS Eligibility Decision.  PharmaEssentia subsequently sought reconsideration of CMS's Eligibility Decision on August 26, 2024, but CMS denied that request for reconsideration on October 30, 2024.  *See* Ex. 8, Aug. 26, 2024 PharmaEssentia Reconsideration Request; Ex. 10, Oct. 30, 2024 CMS Reconsideration Decision at 1.

## BACKGROUND

### A.    The Medicare Program and Part D Prescription Drug Benefit

50.    Medicare is a federal health insurance program for individuals who are 65 or older, as well as certain younger people with disabilities, and people with End-Stage Renal Disease.  *See generally* 42 U.S.C. § 1395 *et seq*.

51.    Medicare is administered by CMS and consists of several parts, including Part A (hospital insurance), Part B (medical insurance), and Part D (prescription drug coverage).  *Id*.

52.    Medicare Part D provides coverage for outpatient prescription drugs through private plans approved by Medicare.  42 U.S.C. §§ 1395w-101 *et seq*.

53.     Medicare Part D beneficiaries can choose to enroll in either a stand-alone Prescription Drug Plan ("PDP") or a Medicare Advantage plan that includes drug coverage ("MA-PD").  *Id.* § 1395w-101(a)(1).

54.     All Medicare Part D plans are offered not by the government itself but by insurance companies and other private companies approved by CMS.  *Id.*

**B.     The Coverage Gap Discount Program**

55.     Until the IRA change that begins in 2025, Medicare Part D includes a coverage gap, also known informally as the "donut hole."  42 U.S.C. § 1395w-102(b)(2)(D), (b)(4).

56.     Specifically, after a beneficiary and his or her plan spend a certain amount on covered drugs during the initial coverage phase, the beneficiary enters the coverage gap and has to pay a certain, significant percentage of drug costs until the beneficiary reaches the catastrophic coverage phase.  *Id.* § 1395w-102(b)(2)(D), (b)(4).

57.     In order to financially assist patients in the coverage gap, Congress established the Coverage Gap Discount Program as part of the Affordable Care Act in 2010.  Pub. L. No. 111-148, § 3301, 124 Stat. 119, 461–68 (2010).

58.     Under this program, drug manufacturers that wished for their drugs to be covered under Part D were required to sign agreements with CMS to provide discounts on drugs dispensed to beneficiaries in the coverage gap.  42 U.S.C. § 1395w-114a(b), (g).

59.     The Bipartisan Budget Act of 2018 made significant changes to the coverage gap discount structure.  Pub. L. No. 115-123, § 53116, 132 Stat. 64, 306–07 (2018).  The law increased the manufacturer discount for brand-name drugs and reduced beneficiary coinsurance in the coverage gap.  Part D plans also became responsible for a portion of drug costs starting in 2019.

60.     By 2020, the financial burden for brand-name drugs in the coverage gap was allocated as follows: 70% manufacturer discounts, 25% beneficiary payment, and 5% Medicare Part D plan payments.  42 U.S.C. §§ 1395w-102(b)(2)(C)-(D), 1395w-114a(g)(4)(A).

**C.     The Inflation Reduction Act's Medicare Part D Redesign**

61.     On August 16, 2022, the Inflation Reduction Act was enacted into law.  Pub. L. No. 117-169, 136 Stat. 1818 (2022).

62.     The IRA makes significant changes to the Medicare Part D benefit design and manufacturer discounts, with the changes at issue here starting in 2025.  *Id*. § 11201, 136 Stat. at 1877–1880 (codified at 42 U.S.C. § 1395w-102).

63.     The IRA aimed to further reallocate cost-sharing for Part D prescription drugs, removing cost burdens from beneficiaries and assigning them instead to manufacturers, Medicare Part D plans, and the federal government.

64.     Key changes under the IRA include eliminating the coverage gap, leaving only an initial coverage phase and catastrophic phase of coverage, and capping beneficiary out-of-pocket spending at $2,000 annually, adjusted for inflation.

65.     As relevant here, the IRA establishes two phases for Part D coverage—an "initial phase" followed by a "catastrophic phase"—and requires drug manufacturers to pay discounts of 10% on their drugs when dispensed to beneficiaries in the initial coverage phase and 20% when dispensed to beneficiaries in the catastrophic phase.

66.     At first glance, these discounts appear lower than the pre-IRA 70% discount manufacturers provided to beneficiaries during the coverage gap.  A beneficiary, however, remained in the coverage gap only until drug expenditure reached a certain amount, at which point the beneficiary transitioned to the catastrophic phase, and the manufacturer discount ended.  Under

the IRA, the beneficiary remains in the catastrophic phase for the remainder of the plan year, so that the 20% manufacturer discount is due on a significantly greater number of dispenses.

67.    The upshot is that, in the aggregate, the IRA imposes greater discounts on manufacturers, because they are exposed to uncapped responsibility for discounts throughout the catastrophic phase of coverage.

68.    The IRA did not impose this greater cost-sharing all at once for all manufacturers: Instead, the IRA provides for a gradual phase-in of the new manufacturer discounts for certain manufacturers meeting specific criteria.  42 U.S.C. § 1395w-114c.

69.    Under these phase-in options, the manufacturer's required discounts to specified Medicare Part D beneficiaries start at just 1% in 2025 and gradually increase each year until reaching the full 10% (for the initial coverage phase) or 20% (for the catastrophic phase) by 2031.

70.    There are two phase-in options.  The first is for a "Specified Manufacturer."  *Id.* § 1395w-114c(g)(4)(B).  For these qualifying "Specified Manufacturers," the phase-in is only available for "certain drugs dispensed to LIS [Low-Income Subsidy] beneficiaries."  *Id.*  Dispenses to non-LIS beneficiaries incur the full 10% and 20% discounts, beginning in 2025.  *See id.*

71.     In other words, the reductions in discounts (and reductions in cost-sharing) for Specified Manufacturers pertain to a narrow population of Medicare beneficiaries, namely, low-income patients.

72.    A Specified Manufacturer is defined as a "manufacturer of an applicable drug …which, in 2021," had (1) a "coverage gap discount agreement" in place under section 1395w-114a; (2) the "total expenditures for all of the specified drugs of the manufacturer covered by such agreement or agreements for such year and covered under this part during such year represented less than 1.0 percent of the total expenditures under this part for all covered Part D drugs during

such year"; and (3) "the total expenditures for all of the specified drugs of the manufacturer that are single source drugs and biological products for which payment may be made under part B during such year represented less than 1.0 percent of the total expenditures under part B for all drugs or biological products for which payment may be made under such part during such year." *Id.* § 1395w-114c(g)(4)(B)(ii).

73.    In essence, Specified Manufacturers are those small manufacturers that impose minimal costs on the Medicare program as a whole, in light of their small size.

74.    CMS granted PharmaEssentia Specified Manufacturer status in its April 4, 2024 notification.  PharmaEssentia qualified for this status because, in 2021 (1) it had a coverage gap discount agreement in effect for one drug, BESREMi; (2) its Part D expenditures on BESREMi, its only Part D drug, were less than 1% of its total Part D program expenditures; and (3) there were no Part B expenditures for any PharmaEssentia drugs.

75.    The second phase-in option is for Specified Small Manufacturers.  *Id.* § 1395w-114c(g)(4)(C).  This phase-in option is not confined to dispenses to Low-Income Subsidy Part D beneficiaries.  *See id.*  Instead, it applies to applicable drugs "dispensed for an applicable beneficiary."  *Id.*  In other words, unlike the Specified Manufacturer phase-in, the Specified Small Manufacturer phase-in applies to all Part D dispenses.

76.    Accordingly, the reductions in discounts (and reductions in cost-sharing) for Specified Small Manufacturers pertain to a larger population of patients, namely, all Medicare Part D beneficiaries, not just low-income beneficiaries.

77.    As a result, Specified Small Manufacturer status confers greater relief upon the manufacturer, compared to Specified Manufacturer status.

78.     Congress's statutory design thus reflects a careful allocation of financial responsibilities among different types of manufacturers, depending upon their ability to bear increasing cost-sharing over time, as assessed by Congress.

79.     A Specified Small Manufacturer is a "manufacturer of an applicable drug for which, in 2021," (1) the manufacturer is a "Specified Manufacturer" as defined in § 1395w-114c(g)(4)(B)(ii) (which as CMS determined, is the case for PharmaEssentia); and (2) the "*total expenditures under part D for any one of the specified small manufacturer drugs of the manufacturer* that are covered by the agreement or agreements under section 1395w-114a of this title of such manufacturer for such year and covered under this part during such year *are equal to or more than 80 percent of the total expenditures under this part for all specified small manufacturer drugs of the manufacturer* that are covered by such agreement or agreements for such year and covered under this part during such year." *Id.* § 1395w-114c(g)(4)(C)(ii) (emphases added).

80.     In other words, to qualify as a Specified Small Manufacturer, the manufacturer must qualify as a Specified Manufacturer, and also have a single drug that accounts for 80% or more of the "total expenditures" for that manufacturer's portfolio of drugs under Medicare Part D. *See id.*

81.     Accordingly, Specified Small Manufacturers' drug portfolios are highly concentrated in a single drug, viewed from the perspective of Medicare Part D "total expenditures" on that portfolio.  *See id.*

82.     Under the statute, "the term 'total expenditures' includes, in the case of expenditures with respect to part D, the total gross covered prescription drug costs as defined in section 1395w-115(b)(3) of this title." *Id.* § 1395w-114c(g)(4)(D).

83.     Section 1395w-115(b)(3), *i.e.*, Social Security Act section 1860D-15(b)(3), defines "gross covered prescription costs" as follows:  "'[G]ross covered prescription drug costs' means, with respect to a part D eligible individual enrolled in a prescription drug plan or MA-PD plan during a coverage year, ***the costs incurred under the plan***, not including administrative costs, but ***including costs directly related to the dispensing of covered part D drugs during the year and costs relating to the deductible***.  Such costs shall be determined whether they are paid by the individual or under the plan . . . ."  42 U.S.C. § 1395w-115(b)(3) (emphases added).

84.     Putting this all together, "total expenditures" and "gross prescription drug costs" are synonyms, and both refer to the "costs incurred under" a Medicare Part D plan, which includes any costs "directly related to the dispensing" of a covered drug.  *See id.*

**D.     CMS's Methodology for Determining Phase-In Eligibility**

85.     CMS has issued guidance documents outlining the methodology for identifying manufacturers eligible for the Specified Manufacturer and Specified Small Manufacturer discount phase-ins.  *See, e.g.*, CMS, Medicare Part D Manufacturer Discount Program Final Guidance (Nov. 17, 2023) ("CMS Final Guidance");[1] CMS, Medicare Part D Manufacturer Discount Program: Methodology for Identifying Specified Manufacturers and Specified Small Manufacturers (Nov. 17, 2023) ("CMS Methodology").[2]

86.     According to this sub-regulatory guidance, CMS calculated the "three values needed for determining which manufacturers . . . [were] specified manufacturers and specified small manufacturers."  CMS Methodology at 3.

---

[1]  https://www.cms.gov/files/document/manufacturer-discount-program-final-guidance.pdf.

[2]  https://www.cms.gov/files/document/manufacturer-discount-program-specified-and-specified-small-manufacturer-methodology.pdf

87.     As relevant here, these values include "[e]ach drug's percent share of the specified manufacturer's Part D total expenditures."  *Id.*

88.     According to the CMS Methodology guidance, to calculate this percentage, CMS relied on "final action, non-delete Prescription Drug Event (PDE) records submitted as of June 30, 2022, which represents the annual PDE data submission deadline for Part D payment reconciliation, for all Part D drugs dispensed in Benefit Year 2021."  *Id.* at 4.

89.     The final rule allowing Medicare Part D Prescription Drug Event data (PDE data) to be used for program oversight and monitoring, research, analysis, care coordination and disease management, public reporting, public health functions and other purposes was effective on June 27, 2008.  Under the regulation, CMS is authorized to use PDE data for, *inter alia*, "[r]eporting . . . on overall statistics associated with the operation of the Medicare prescription drug program"; "[c]onducting evaluations" of the program; "[m]aking legislative proposals" to Congress, among other uses.  42 C.F.R. § 423.505(f); *see also* 73 Fed. Reg. 30,683 (May 28, 2008).

90.     PDE data is submitted by Medicare Part D plans, not by drug manufacturers.  *See* 42 C.F.R. § 423.505(f) ("The Part D plan sponsor agrees to submit to CMS . . . .").

91.     Every time a beneficiary fills a prescription under Part D, his or her Medicare Part D plan is intended to submit a PDE record to CMS with detailed drug cost and payment information.  42 C.F.R. § 423.505(b)(8), (f)(3), (k)(3).

92.     Plans have until June 30 of the following year to submit final PDE data for drug dispenses during the prior year.  *Id*. § 423.343(c)(1).

### E.     CMS's Known Errors and Inaccuracies Within PDE Data

93.     As explained above, PDE data is submitted by Medicare Part D plans, not by manufacturers like PharmaEssentia.  *See* 42 C.F.R. § 423.505(f).

94.     As part of their routine business operations, manufacturers like PharmaEssentia are able to track *all* dispenses of their drugs, whereas Medicare Part D plans, at most, can track the subset of drug dispenses that *each plan* paid for.

95.     Even for that subset of drugs, Medicare Part D plans frequently submit inaccurate, incomplete, mal-formatted, or otherwise erroneous data into the PDE dataset, and, in many cases, Medicare Part D plans may simply fail to submit data on some drug dispenses altogether.

96.     The integrity of the PDE dataset therefore depends in significant part on the integrity of the data that private Medicare Part D plans choose to submit into that database.

97.      Although CMS has taken steps to attempt to ensure the integrity of its PDE dataset based on these records agglomerated from hundreds of private Medicare Part D plans, CMS has acknowledged that CMS's PDE dataset contains significant errors, among other reasons, as a result of erroneous or missing data inputs from Medicare Part D plans.

98.     For example, in CMS's March 2008 "CMS Guide to Requests for Medicare Part D Prescription Drug Event (PDE) Data," CMS recognized that "errors may exist within the [PDE] data sample." CMS, CMS Guide to Requests for Medicare Part D Prescription Drug Event (PDE) Data at 13 (March 2008).[3] Indeed, CMS stated that "[r]equestors using PDE data should keep in mind that a PDE is not the actual claim paid at the pharmacy, but a record of that claim manipulated by the Part D sponsor prior to its submission to CMS for payment reconciliation. Thus, PDE data may have limitations for certain projects." *Id.* at 12.

---

[3] CMS, CMS Guide to Requests for Medicare Part D Prescription Drug Event (PDE) Data (March 2008), https://www.cms.gov/medicare/prescription-drug-coverage/prescriptiondrugcovgenin/downloads/guidepartdv3-3-17-09-2.pdf#:~:text=CMS%20only%20has%20PDE%20data%20for%20Medicare,for%20Part%20D%20payment%20of%20their%20drug.&text=In%20this%20Page%2013%20case%2C%20the%20pharmacy,amount%20that%20was%20reimbursed%20to%20the%20SPAP.

99.     Further, on April 28, 2023, CMS sent a memorandum to all Part D Plan Sponsors which stated that in the Medicare Part D program, "correct payment is dependent on the accuracy of the Prescription Drug Event (PDE) data submitted by Part D sponsors."  CMS, Continuation of the Prescription Drug Event (PDE) Reports and PDE Analysis Reporting Initiatives for the 2023 Benefit Year at 1 (Apr. 28, 2023).[4]

100.    As such, CMS "strongly encourage[d] sponsors to take an active and consistent approach to ensuring the accuracy of submitted PDE data and resolving errors that lead to PDE rejections." *Id.*

101.    Furthermore, acknowledging that PDE data is at times inaccurate and can contain "errors," *id.*, CMS has, since the 2009 benefit year, "utilized the PDE Analysis initiative to address data quality issues on accepted PDE records."  *Id.* at 2.

102.    Through this initiative, CMS works to alert Medicare Part D plan sponsors of potential data quality issues that CMS detects in accepted PDE records.  *See id.*

103.    CMS expects sponsors to then research the flagged PDE records to determine if the submitted data is valid or invalid and make corrections if needed.  *See id.*

104.    Of course, CMS can only flag the PDE data errors that it is aware of, and does not flag errors it is unaware of, for example, when (1) a Medicare Part D plan entirely fails to report a dispense of a given drug, or (2) a Medicare Part D plan reports a dispense of the drug but that dispense is not recorded properly in the PDE database (for example, due to erroneous data fields, CMS's rejection of the submitted data, or delayed entry after CMS's required June 30 deadline).

---

[4] CMS, Continuation of the Prescription Drug Event (PDE) Reports and PDE Analysis Reporting Initiatives for the 2023 Benefit Year (April 28, 2023), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/Continuation_of_the_PDE_Reports_and_PDE_Analysis_Reporting_Initiatives_for_the_2023_Benefit_Year_G.pdf.

105.    And while CMS can only partially police the accuracy of PDE data, manufacturers like PharmaEssentia are even more limited in their availability to do so.

106.    Because of patient and data privacy concerns, the PDE data that CMS makes publicly available is aggregated, making it impossible to identify specific, individual prescriptions or dispenses.

107.    CMS, meanwhile, internally utilizes the detailed version of the PDE data, not the aggregated data set, and CMS does not allow Part D plans, or manufacturers, full access to the PDE dataset.  Thus manufacturers are not able to search for, identify, or correct data errors or omissions at any time, or to identify whether certain dispenses were not reported at all.[5]

108.    Understandably then, CMS does not rely solely on PDE data in other contexts.

109.    For example, in selecting drugs for CMS's Drug Price Negotiation Program, CMS originally proposed to rely solely on PDE data supplied by Part D plans, but in response to public comments raising concerns that limitations in PDE data required supplemental data sources, CMS acknowledged those concerns and agreed to also consider Average Manufacturer Price (AMP) data provided by manufacturers, as AMP data sometimes will capture sales transactions not timely reflected in PDE data.[6]

---

[5] CMS, Updates to the Prescription Drug Event (PDE) Analysis Website and Data Quality Review Process for the Coverage Gap Discount Program, Manufacturer Disputes, and Part D Payment Reconciliation (Apr. 4, 2018), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/hpms_cgdp_pde_analysis_website_04-04-2018_245.pdf.

[6] CMS, Medicare Drug Price Negotiation Program: Revised Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2026 (June 30, 2023), https://www.cms.gov/files/document/revised-medicare-drug-price-negotiation-program-guidance-june-2023.pdf.

**F.      CMS's Adoption of PDE Data For The Phase-In Methodology**

110.    Notwithstanding the foregoing, well-documented challenges with CMS's PDE data, CMS decided to adopt PDE data as its sole and exclusive source of data for evaluating Medicare Part D total expenditures and, in turn, identifying Specified Small Manufacturers.

111.    Specifically, on May 12, 2023, CMS released the Medicare Part D Manufacturer Discount Program Draft Guidance, and voluntarily solicited comment during a 30-day comment period which closed on June 12, 2023.  Then, on November 17, 2023, CMS published its Medicare Part D Manufacturer Discount Program Final Guidance, with summaries of public comments.[7]

112.    However, despite accepting comment on several aspects of its proposed Medicare Part D Manufacturer Discount Program guidance, CMS did not accept public comment on the use of PDE data as CMS's sole and exclusive source of data for evaluating Medicare Part D expenditures and identifying manufacturers' eligibility as Specified Small Manufacturers.

113.    Instead of accepting comment on this issue, CMS unilaterally stated it would "identify which manufacturers qualify for these phase-ins by analyzing Medicare Part B claims data, Part D PDE data, and ownership information submitted by manufacturers."  CMS Final Guidance at 27.

114.    In its Manufacturer Discount Program Final Guidance, CMS noted that "[s]everal commenters requested that CMS publish its methodology for determining eligibility phase-ins, as well as any data relied on to make the determination, as far in advance as possible, and provide interested parties an opportunity to provide comment."  *Id.* at 6.

---

[7] CMS, Medicare Part D Manufacturer Discount Program Final Guidance (Nov. 17, 2023), https://www.cms.gov/files/document/manufacturer-discount-program-final-guidance.pdf.

115.    CMS responded that while it would publish its methodology in the companion guidance, due to "time limitations," CMS "[would not] accept comment on the methodology." *Id.*

116.    CMS thus unilaterally decided, without public comment, to rely on PDE data as its sole source of data for evaluating Medicare Part D drug costs, and whether, in turn, those drug costs qualified a manufacturer as a Specified Small Manufacturer.

117.    Disappointingly, but not surprisingly, in light of CMS's decision to rely exclusively on PDE data, CMS did not see fit to provide any mechanism for manufacturers to submit, or CMS to consider, other forms of cost data, to supplement PDE data, in support of manufacturers' request for Specified Small Manufacturer phase-in eligibility. *See id.*

### G.    PharmaEssentia's BESREMi Drug Product

118.    In November 2021, FDA approved PharmaEssentia's first and only U.S. product to date, BESREMi, for the treatment of adults with polycythemia vera, a rare blood cancer.

119.    Polycythemia vera is most commonly diagnosed in patients age 60 to 65 and can cause a consistent, high risk of thrombosis (blood clots) and hemorrhage (bleeding).  Many patients do not achieve strong clinical outcomes using the historical treatment options available.

120.    BESREMi was the first interferon product specifically approved for polycythemia vera.  It was approved for the treatment of adults with polycythemia vera regardless of their treatment or risk profile.

121.    The National Comprehensive Cancer Network ("NCCN") Guidelines list BESREMi as a preferred initial cytoreductive (cancer-cell reducing) therapy for both low- and high-risk adult polycythemia vera patients.

122.    The first sale of BESREMi occurred on December 6, 2021.

123.    Later that month Onco360, PharmaEssentia's contracted specialty pharmacy, dispensed three units of BESREMi to Medicare Part D beneficiaries, on December 14, 23, and 28,

2021, respectively.  Two Medicare Part D plans, namely Express Scripts Medicare Prescription

Drug Plan, and Caremark Prescription Drug Plan, paid for these 2021 dispenses to the Medicare

Part D beneficiaries.

124.    As PharmaEssentia has explained to CMS in requesting Specified Small

Manufacturer phase-in eligibility:

> More specifically, the company sold three units of product in 2021 on December 17, 23 and 28, 2021, and at least one of those units was paid for by the relevant Part D Plan in 2021.  The dispensing specialty pharmacy, Onco360, has provided the following information on the dispensing of the drug, the name of the Part D Plan that paid for the drug, and the date the payment was received by the dispensing pharmacy:

| SP_Patient_ID | PLAN_NAME | Pay_Type | BIN | PCN | Claim Drug Name | Date Claim Submitted | Claim DOS | Date Pharmacy Received Payment |
|---|---|---|---|---|---|---|---|---|
| 125 | EXPRESS SCRIPT MCR PDP | MED - D | 610014 | MEDDPRIME | Besremi 500 mcg/mL Syringe | 12/17/2021 | 12/14/2021 | 12/29/2021 |
| 253 | CAREMARK PDP | MED - D | 004336 | MEDDADV | Besremi 500 mcg/mL Syringe | 12/23/2021 | 12/23/2021 | 1/5/2022 |
| 125 | EXPRESS SCRIPT MCR PDP | MED - D | 610014 | MEDDPRIME | Besremi 500 mcg/mL Syringe | 12/28/2021 | 12/28/2021 | 1/5/2022 |

*See* Ex. 6, April 30, 2024 PharmaEssentia Recalculation Request Letter at 1.

125.    PharmaEssentia maintains detailed records of each of these three Medicare Part D

dispenses that took place during 2021.

126.    For example, on December 29, 2021, Express Scripts Medicare Drug Plan paid the

claim for the unit of BESREMi dispensed to the Medicare Part D beneficiary on December 14,

2021.  *Id.*

127.    Indeed, PharmaEssentia has payment data showing that Express Scripts Medicare

Drug Plan paid for this unit of BESREMi on December 29, 2021.



128.    As further detailed below, Express Scripts Medicare Drug Plan (group ID KU5A) paid for this unit of BESREMi on December 29, 2021.

```
                          Billing Response

Patient Name                              [REDACTED]
--------------------------------------------------------------
Date Printed                          : 07/05/2024
Pharmacy Identifier                   : [REDACTED]
Invoice Number                        : 1523112
Prescription Number                   : 0060153034
Date filled                           : 12/14/2021 12:00:00 AM
Days Supply                           : 28
--------------------------------------------------------------
Cost                                  : 13976.00
Reimbursement                         : 13668.93
Profit                                : -307.07
Margin                                :   -2.25 %

                  Billed      Paid
Ingr Cost        20125.44   13668.53  Discount    6456.91    32.08 %
Fee                  5.50       0.40  Discount       5.10    92.73 %

Total            20130.94   13668.93  Discount    6462.01    32.10 %
--------------------------------------------------------------
Drug Name                             : Besremi 500 mcg/mL Syringe
NDC #                                 : 73536060001
Quantity (metric)                     : 2
--------------------------------------------------------------
Response Received Date/Time           : 12/17/2021 10:39:12 AM
--------------------------------------------------------------
Claim Status                          : Payable
Group ID (C1)                         : KU6A
Network Reimbursement ID (2F)         : MEDRESPLTY
Transaction Response Status (AN)      : P
Authorization Number (F3)             :
Approved Message Code Count (6F)      :
Approved Message Code (6F)            :
Approved Message Code (6F)            :
Additional Message Information Count (UF)     :
Additional Message Information Qualifier (UH) :
Additional Message Information (FQ)   :
Additional Message Information Qualifier (UH) :
Additional Message Information (FQ)   :
Rx/Service Ref. Qualifier (EM)        :
Rx Number/Service Ref # (D2)          : 60153034
Patient Pay Amount (F5)               : 100.00
Ingredient Cost Paid (F6)             : 13668.53
Dispensing Fee Paid (F7)              : 0.40
Flat Sales Tax Amount Paid (AN)       : 0.00
Percentage Sales Tax Amount Paid (AX) : 0.00
Total Amount Paid (F9)                : 13668.93
Basis Of Reimbursement Determination (FM) : 9
Amount Of Copay/CoInsurance (FI)      : 100.00
Amount of Copay/Co-insurance (FI)     : 100.00
DUR/PPS Response Counter (J6)         :
DUR/PPS Response Counter (J6)         :
Reason For Service Code (E4)          :
Clinical Significance Code (FS)       :
Previous Date Of Fill (FU)            :
Quantity Of Previous Fill (FV)        :
Database Indicator (FW)               :
DUR Free Text (FY)                    :
```

129.    Accordingly, there was an expenditure by a Medicare Part D plan for BESREMi in 2021.

130.    And on top of that, the same pharmacy dispensed BESREMi to a Medicare Part D beneficiary two additional times, on December 23 and December 28, 2021, and the pharmacy received payment from the Medicare Part D plan on January 5, 2022.  *See* Ex. 6, April 30, 2024 PharmaEssentia Recalculation Request Letter at 1.

## H.    CMS's Determination of PharmaEssentia's Phase-In Eligibility

131.    Based on the cost information that PharmaEssentia presented to CMS and further detailed above, it should be clear that PharmaEssentia is a Specified Small Manufacturer, because it dispensed only a single drug in 2021, and received payment from Medicare Part D plans for that drug's dispenses that took place in 2021.  42 U.S.C. § 1395w-114c(g)(4)(C)(ii).

132.    But CMS has chosen to treat the information on the three dispenses above as completely irrelevant, and refused to consider that information as part of its Specified Small Manufacturer determination.

133.    Instead, CMS has taken the position that <u>only</u> third-party PDE data is relevant to its analysis of whether a manufacturer qualifies as a Specified Small Manufacturer, and CMS will not consider cost data submitted by a manufacturer as part of CMS's decisionmaking process.

134.    PharmaEssentia subsequently uploaded its information to the HPMS Manufacturer Portal to enable CMS to determine PharmaEssentia's eligibility for the Specified Manufacturer and Specified Small Manufacturer phase-ins.  *See* CMS Final Guidance at 27–29 § 50.2.

135.    The data fields that CMS asked PharmaEssentia to populate in the HPMS Manufacturer Portal include basic identifying information like the manufacturer's name, identifying number, contact information, and corporate ownership details.

136.    Notably, there are no fields for manufacturers to input actual 2021 Part D plan expenditures on their drugs.  *See* Ex. 1, Part D Manufacturer Discount Program Data Entry Fields in HPMS.

137.    Following PharmaEssentia's submission of this ownership data, in an email to PharmaEssentia dated January 31, 2024, CMS issued a non-binding, preliminary determination that PharmaEssentia was a Specified Manufacturer, and not a Specified Small Manufacturer.  Ex. 2, Jan. 31, 2024 CMS Preliminary, Non-Binding Information Email.

138.    In that email, CMS stated that it "reviewed the ownership data [PharmaEssentia] submitted and attested to through the Manufacturer Discount Program module in the Health Plan Management System (HPMS) and any supplemental information [PharmaEssentia] provided." The email also stated that soon PharmaEssentia would "receive a separate email . . . that provides a secure link to a Box folder containing a file with data elements CMS used in this analysis." *Id.*

139.    This was the first time that PharmaEssentia learned that CMS did not identify in its PDE database Part D dispense data for the three dispenses of BESREMi in 2021.

140.    Then, in an email to PharmaEssentia dated April 4, 2024, CMS provided its initial determination that PharmaEssentia qualifies as a Specified Manufacturer for purposes of the phase-in discounts, but not as a Specified Small Manufacturer.  Ex. 4, April 4, 2024 CMS Phase-In Eligibility Determination Notice.

141.    CMS further stated in its April 4, 2024 email that CMS's "determination could change if CMS learns that the information relied on is not accurate." *Id.*

142.    CMS's April 4, 2024 email stated that if PharmaEssentia "disagree[d] with the outcome of the application of those requirements, [it] may request a recalculation of this determination.  [The] recalculation request must be received by CMS no later than 30 calendar days from the date of this notice," and should "include or describe any relevant supporting information." *Id.*  CMS stated that "[a]fter consideration of the issues raised in the recalculation request, CMS will decide whether to perform the recalculation, and will issue a written decision to the manufacturer . . . that will include CMS' decision about whether to perform the requested recalculation and, if such recalculation is performed, the resulting eligibility determination." *Id.*

143.    CMS also stated that the "disposition of a recalculation request is final and binding, subject to the requirements of the Discount Program under section 1860D-14C of the Act, the Final Guidance and Methodology, and the Discount Program agreement." *Id.*

144.    On April 30, 2024, PharmaEssentia timely submitted a request for recalculation along with further evidence that PharmaEssentia qualifies for the Specified Small Manufacturer phase-in. Ex. 5, April 30, 2024 PharmaEssentia Phase-In Eligibility Recalculation Request Email; Ex. 6, April 30, 2024 PharmaEssentia Recalculation Request Letter.

145.    In its request, PharmaEssentia provided evidence, as identified above, that PharmaEssentia dispensed BESREMi three times to Part D beneficiaries in December 2021, and that Medicare Part D plans paid for those December 2021 dispenses. Ex. 2, April 30, 2024 PharmaEssentia Recalculation Request Letter. Thus, PharmaEssentia qualified as a Specified Small Manufacturer for the phase-in under section 1860D-14C(g)(4)(C)(ii) of the Act. *Id.*

146.    On June 4, 2024, CMS issued its Eligibility Decision on PharmaEssentia's Specified Small Manufacturer status. Ex. 7, June 4, 2024 CMS Eligibility Decision.

147.    CMS's Eligibility Decision stated that CMS had determined that PharmaEssentia is eligible only for the Specified Manufacturer phase-in. *Id.* at 2.

148.    The Eligibility Decision explained that "CMS calculated the Part D total expenditures for 2021 reported on all final action, non-delete PDE records submitted as of June 30, 2022, which represents the annual PDE data submission deadline for Part D payment reconciliation, for all Part D drugs dispensed in Benefit Year 2021." *Id.*

149.    CMS stated that "[b]ased on PharmaEssentia's request, CMS conducted additional data reviews, but again determined there are no final action, non-delete PDEs with 2021 dates of service for any applicable drug under PharmaEssentia's FDA-assigned labeler code 73536." *Id.*

150. CMS therefore determined that "based on the recalculation and for the reasons stated above, there is no change to the discount phase-in eligibility determination CMS sent to you on April 4, 2024 reflecting that **PharmaEssentia is a specified manufacturer**." *Id.* (emphasis in original).

151. CMS stated that its Eligibility Decision was "final and binding." *Id.*

152. PharmaEssentia subsequently sought reconsideration of CMS's Eligibility Decision on August 26, 2024. *See* Ex. 8, Aug. 26, 2024 PharmaEssentia Reconsideration Request. PharmaEssentia provided CMS with the same information identified above and also additional written records supporting PharmaEssentia's request, *see* Ex. 9, Oct. 16, 2024 PharmaEssentia Reconsideration Submission, but CMS denied that request for reconsideration on October 30, 2024, *see* Ex. 10, Oct. 30, 2024 Reconsideration Decision.

153. In its Reconsideration Decision issued on October 30, 2024, CMS acknowledged that PharmaEssentia had provided "data supplied by a contracted specialty pharmacy regarding three dispenses of BESREMI."  However, CMS maintained its position that "CMS calculated the Part D total expenditures for 2021 based on all final action, non-delete Prescription Drug Event (PDE) records for dates of service in 2021," and that "[b]ecause there are no final action, non-delete PDEs with 2021 dates of service for any applicable drug under PharmaEssentia's FDA-assigned labeler code, CMS is making no change to the phase-in eligibility determination sent to PharmaEssentia on April 4, 2024." Ex. 10, Oct. 30, 2024 CMS Reconsideration Decision at 1.

154. In sum, in both the Eligibility Decision and its subsequent Reconsideration Decision, CMS found that because CMS's PDE data did not capture PharmaEssentia's three Medicare Part D dispenses in December 2021, it was beside the point that PharmaEssentia provided other evidence that those three dispenses resulted in costs expended by Medicare Part D

plans in December 2021. *See* Ex. 7, June 4, 2024 CMS Eligibility Decision; Ex. 10, Oct. 30, 2024 CMS Reconsideration Decision at 1.

155. As a result, CMS completely disregarded the record evidence of costs incurred under Medicare Part D for PharmaEssentia's single drug, instead relying solely on PDE data. *Id.*

156. Had CMS considered the record evidence of Part D dispenses and payments that PharmaEssentia submitted, and not just the flawed PDE data, BESREMi expenditures would have accounted for 100% of 2021 Part D expenditures on PharmaEssentia's drugs, making PharmaEssentia eligible for the Specified Small Manufacturer phase-in. *See id.*

## I.    CMS's Eligibility Decision And Reconsideration Decision Are Unlawful

157. CMS's Eligibility Decision and Reconsideration Decision finding that PharmaEssentia does not qualify as a Specified Small Manufacturer violate the governing statute.

158. A Specified Small Manufacturer means "a manufacturer of an applicable drug for which, in 2021 . . . the total expenditures under part D for any one of the specified small manufacturer drugs . . . are equal to or more than 80 percent of the total expenditures under this part for all specified small manufacturer drugs of the manufacturer . . . ."  42 U.S.C. § 1395w-114c(g)(4)(C)(ii).

159. "Total expenditures" "includes, in the case of expenditures with respect to Part D, the total gross covered prescription drug costs, as defined in section 1395w-115(b)(3)."  42 U.S.C. § 1395w-114c(g)(4)(D).

160. "[G]ross covered prescription drug costs" is defined as, "with respect to a part D eligible individual enrolled in a prescription drug plan or MA-PD plan during a coverage year, *the costs incurred under the plan*, not including administrative costs, but *including costs directly related to the dispensing of covered part D drugs during the year and costs relating to the deductible*."  42 U.S.C. § 1395w-115(b)(3) (emphasis added).

161.    Because PharmaEssentia marketed only BESREMi in the U.S. in 2021, if PharmaEssentia had *any dispenses at all* in 2021 that resulted in *any costs at all* by a Medicare Part D plan, by definition, the "costs directly related to the dispensing of covered part D drugs during the year" would be a non-zero amount, 42 U.S.C. § 1395w-115(b)(3), and thus the "the total expenditures under part D for any *one* of the specified small manufacturer drugs" would be "more than 80 percent of the total expenditures under this part for all specified small manufacturer drugs of the manufacturer."   42 U.S.C. § 1395w-114c(g)(4)(C)(ii).   As a matter of fact, for PharmaEssentia, it would be 100%.

162.    The plain text of the statute requires CMS to consider the "costs incurred under the [Part D] plan" that "directly relate[] to the dispensing of covered part D drugs."   42 U.S.C. § 1395w-115(b)(3).

163.    The statute does not specify that the "costs incurred under the [Part D] plan" that "directly relate[] to the dispensing of covered part D drugs" are derived solely from PDE data, as CMS determined here.  *See id.* § 1395w-114c(g)(4)(D); § 1395w-115(b)(3).

164.    It is a "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself."   *Citrus HMA, LLC v. Becerra*, 597 F. Supp. 3d 450, 459 (D.D.C. 2022), *appeal dismissed*, No. 22-5173, 2022 WL 4390451 (D.C. Cir. Sept. 16, 2022); *see also Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute.").

165.    And with the Supreme Court's recent overruling of *Chevron*, a court must apply its "independent judgment" to arrive at the "best reading of the statute," *i.e.*, the "reading the court

would have reached" if no agency interpretation had been involved.  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).

166.    The term "costs" has a meaning that is clear and unambiguous:  A cost is an "amount or equivalent paid or charged for something," *i.e.*, a "price."  Costs, Webster's Dictionary (2024); *see also* Cost, Black's Law Dictionary (11th ed. 2019) ("The amount paid or charged for something; price or expenditure.").

167.    The question in this case, then, is whether an amount paid by a Medicare Part D plan for the dispensing of a drug to a Medicare Part D beneficiary amounts to a "cost," *i.e.*, an "amount or equivalent paid or charged for something," if that amount *is in fact paid for the drug* but is *not reported* in CMS's PDE database.

168.    The statutory text is clear:  Congress chose to define a Specified Small Manufacturer based on the "costs directly related to the dispensing of covered part D drugs during the year," rather than to the "costs ***reported in CMS's PDE data*** directly related to the dispensing of covered part D drugs during the year," as CMS has taken the position here.  *See* 42 U.S.C. § 1395w-115(b)(3) (bold text added).

169.    Had Congress wished to confine CMS's analysis of "costs" solely to PDE data, Congress would have said so expressly.  *See id.*

170.    As the D.C. Circuit has expressly recognized, even in the era of *Chevron* deference, an agency could not "place additional requirements" that go beyond a statute's text where "Congress chose not to include an additional requirement."  *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 331 (D.C. Cir. 2020).

171.    Yet that is exactly what CMS has done in this case.  PharmaEssentia submitted data to CMS demonstrating that it qualifies as a Specified Small Manufacturer because it had Part D

sales of its only drug, BESREMi, in 2021, for which a Medicare Part D plan incurred costs, *i.e.*, paid for the drug. 42 U.S.C. § 1395w-114c(g)(4)(C)(ii).

172.    CMS's contrary Eligibility Decision and Reconsideration Decision, which refused to even consider PharmaEssentia's evidence that Part D plans incurred costs to pay for BESREMi in 2021, instead looking solely and exclusively to admittedly flawed PDE data, are contrary to law. *See* § 1395w-115(b)(3).

173.    The statute does not authorize CMS to pretend that these costs were not incurred by the Medicare Part D plans to pay for BESREMi, just because CMS's PDE database fails to identify those costs. *See id.*

174.    CMS's Eligibility Decision and Reconsideration Decision are also arbitrary and capricious, for multiple, interrelated reasons.

175.    First, and most fundamentally, CMS failed to comply with its fundamental duty to "base its decision on the entire record." *Purepac Pharm. Co.*, 354 F.3d at 885. CMS cannot simply blinker itself to record evidence of costs incurred by Medicare Part D plans. *See id.*

176.    CMS's decision to rely solely on PDE data, without considering PharmaEssentia's cost data submitted in connection with the recalculation process and CMS's subsequent Reconsideration Decision, also fails to consider multiple important aspects of the problem.

177.    PDE data depends on self-reporting by Medicare Part D plans, not manufacturers, and those Medicare Part D plans do not ensure the PDE database is complete and error-free, as CMS has expressly acknowledged.

178.    Nor are private Medicare Part D plans adequate surrogates for the interests of manufacturers, who may possess their own data on payments made by Part D plans, even when Part D plans fail to submit records to the PDE database.

179.    In fact, Medicare Part D plans often have interests *adverse* to drug manufacturers like PharmaEssentia, including insofar as the grant of Specified Small Manufacturer status reduces the manufacturer's cost sharing while increasing the plan's cost sharing burden.

180.    By choosing to consider only third-party, unvalidated PDE data, to the exclusion of other cost data in the record, and without *any consideration whatsoever* of the well-known flaws, errors, and omissions with the PDE database, the agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

181.    Notably, in settling on that arbitrary and capricious methodology, CMS did not even solicit comments on its decision to rely solely on PDE data, which would have allowed CMS to evaluate these known problems and reach a reasoned decision whether to utilize that data alone.

182.    Instead, CMS expressly refused to accept comments on its methodology to evaluate manufacturer phase-in eligibility based solely on PDE data.

183.    And in its Eligibility Decision and Reconsideration Decision under review, CMS expressly refused to consider the record evidence and arguments that "whether or not the Part D Plan correctly submitted its PDE reports, the dispensing event and Part D reimbursement clearly happened in 2021." Ex. 6, April 30, 2024 PharmaEssentia Recalculation Request Letter at 1-2.

184.    Moreover, even if CMS could permissibly rely on PDE data as part of its Specified Small Manufacturer phase-in determination, CMS failed to consider obvious alternatives that would have permitted CMS to ensure the data that CMS relied upon was accurate.

185.    For example, CMS could have relied on PDE data as *prima facie* evidence, but also considered, as part of its recalculation process, evidence that the PDE data was incomplete, and worked with Medicare Part D plans to reconcile and remediate any errors or omissions in the PDE

database identified as part of its recalculation process, such as the omissions raised by PharmaEssentia.

186.    Or, CMS could have simply considered manufacturer-specific evidence of errors in the PDE database, such as the evidence submitted by PharmaEssentia, and weighed that evidence in its determination.

187.    Instead, CMS determined that, in its Eligibility Decision and its Reconsideration Decision, it would take the PDE dataset as given, and refuse to consider evidence that CMS's PDE dataset was incomplete.

188.    CMS's refusal to consider evidence that its PDE data is incomplete and erroneous in its Eligibility Decision and Reconsideration Decision is particularly arbitrary and capricious, because in *other* contexts, CMS *has* provided established mechanisms to remediate flawed PDE data when CMS identifies errors in the PDE data, and to rely on *other* data sources.

189.    CMS provided no explanation for why it undertakes efforts to promote the validity of PDE data and remediate known errors when *other* errors are detected in the PDE database, but chose to ignore the errors identified in this case, and to take no steps to remediate them.

190.    CMS's refusal to consider alternatives to remediate or otherwise address identified flaws in its PDE dataset is consummately arbitrary and capricious, as it "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and ignored an obvious alternative that could have avoided knowingly relying on a flawed, uncorrected PDE dataset. *See, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (agency must consider "alternatives that are within the ambit of the existing policy" (internal quotation marks and citation omitted)).

## CLAIMS FOR RELIEF

### CLAIM I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
#### CMS's Eligibility Decision and Reconsideration Decision Are Contrary To Law
#### Violation of 5 U.S.C. § 706; 42 U.S.C. § 1395w-114c

191.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

192.    The APA prohibits Defendants from acting in any way that is arbitrary and capricious or an abuse of discretion, or that is not in accordance with law, or that is in excess of statutory jurisdiction or authority or short of statutory right.  5 U.S.C. § 706(2)(A), (C).

193.    PharmaEssentia is a Specified Small Manufacturer under 42 U.S.C. § 1395w-114c(g)(4)(C), which is readily apparent given its submission of information demonstrating that Medicare Part D plans paid for the dispense of its only Part D eligible drug, BESREMi, in 2021.

194.    CMS's Eligibility Decision's and Reconsideration Decision's determination that PharmaEssentia is not a Specified Small Manufacturer is contrary to law because it violates the plain text of 42 U.S.C. § 1395w-114c(g)(4)(C), § 1395w-114c(g)(4)(D), and § 1395w-115(b)(3).

195.    Here, Congress by statute defined the criteria to be eligible for phase-in as a Specified Small Manufacturer under 42 U.S.C. § 1395w-114c.

196.    Because PharmaEssentia has only one drug available on the U.S. market, if PharmaEssentia had any dispenses at all in 2021 that resulted in any costs at all by a Medicare Part D plan, by definition the "costs directly related to the dispensing of covered part D drugs during the year" would be a non-zero amount, 42 U.S.C. § 1395w-115(b)(3), and thus the "the total expenditures under part D for any *one* of the specified small manufacturer drugs" would be "more than 80 percent of the total expenditures under this part for all specified small manufacturer drugs of the manufacturer."  42 U.S.C. § 1395w-114c(g)(4)(C)(ii).

197.    CMS added an impermissible requirement to Congress's chosen definition of "total expenditures" by limiting qualifying "costs" to only costs reflected in CMS's PDE dataset.

198.    Contrary to CMS's determinations, Congress specified through its carefully constructed statute that these "total expenditures," *i.e.*, "gross covered prescriptions costs," are simply "costs incurred under the plan," "including costs directly related to the dispensing of covered part D drugs during the year."  42 U.S.C. § 1395w-115(b)(3).

199.    Congress did not choose to limit the relevant "costs" solely to CMS's PDE data, but contemplated any "costs," *i.e.*, any expenditures by a Medicare Part D plan for the dispensing of a Medicare Part D drug, as "costs" forming part of the "total expenditures" for a drug under Medicare Part D.  *Id.* § 1395w-115(b)(3); *see also id.* § 1395w-114c(g)(4)(D).

200.    For the foregoing reasons, Defendants' Eligibility Decision and Reconsideration Decision failing to classify PharmaEssentia as a Specified Small Manufacturer are contrary to law.

### CLAIM II: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
**CMS's Eligibility Decision and Reconsideration Decision Are Arbitrary And Capricious**
**Violation of 5 U.S.C. § 706**

201.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

202.    The APA prohibits Defendants from acting in any way that is arbitrary and capricious.  5 U.S.C. § 706(2)(A), (C).

203.    CMS's decision to rely solely on PDE data, without considering PharmaEssentia's cost information in the administrative record, is arbitrary and capricious.

204.    CMS failed to comply with its fundamental duty to "base its decision on the entire record" of costs incurred for dispenses of BESREMi.  *Purepac Pharm. Co.*, 354 F.3d at 885.

205.    In addition, CMS's choice to not consider any other evidence of costs apart from PDE data when determining costs is arbitrary and capricious because the agency itself has explained that PDE data contains significant errors, omissions, and inaccuracies.

206.    Notably, the contents of the PDE data are completely outside of PharmaEssentia's control, and yet have very significant economic consequences, running to tens of millions of dollars as a result of CMS's erroneous Eligibility Decision and Reconsideration Decision.

207.    And as explained above, manufacturers and the Part D plans that submit PDE records to CMS often have adverse economic interests, such that Part D plans are not adequate surrogates for manufacturers.

208.    By choosing to consider only third-party, unvalidated PDE data, to the exclusion of other cost data, CMS "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43.

209.    Moreover, even if CMS could permissibly rely on PDE data in identifying a Specified Small Manufacturer, CMS failed to consider obvious alternatives that would have permitted CMS to ensure the data that CMS relied upon was accurate.

210.    For example, CMS could have relied on PDE data, but considered, as part of its Eligibility Decision and Reconsideration Decision, evidence that the PDE data was incomplete.

211.    Or, CMS could have worked with Medicare Part D plans to reconcile and remediate any errors identified as part of its Specified Small Manufacturer eligibility determination process.

212.    Instead of considering those options, CMS determined that, in its Eligibility Decision and Reconsideration Decision, it would take the PDE dataset as controlling, and refuse to consider evidence that CMS's PDE dataset was incomplete or in error.

213.    CMS's refusal to consider these alternatives to relying on flawed PDE data is arbitrary and capricious, because in other contexts, CMS has provided mechanisms to remediate flawed PDE data when errors are identified.

214.    For the foregoing reasons, Defendants' Eligibility Decision and Reconsideration

Decision failing to classify PharmaEssentia as a Specified Small Manufacturer are arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, PharmaEssentia respectfully requests that this Court enter judgment in its favor and grant the following relief:

a.    A declaration pursuant to 28 U.S.C. § 2201 stating that:

    i.    CMS's determination that PharmaEssentia is not a Specified Small Manufacturer is contrary to law because CMS's determination contravened 42 U.S.C. § 1395w-114c; and

    ii.    CMS's determination that PharmaEssentia is not as a Specified Small Manufacturer is arbitrary and capricious.

b.    An order setting aside CMS's determination that PharmaEssentia is not a Specified Small Manufacturer.

c.    An order directing CMS to determine PharmaEssentia's phase-in eligibility under 42 U.S.C. § 1395w-114c within 21 days of the Court's order by reviewing all "total expenditures under Part D," not limited to Prescription Drug Event Data.

d.    An order requiring CMS to reclassify PharmaEssentia as a Specified Small Manufacturer for the purpose of phase-in eligibility under the Part D Manufacturer Discount Program.

e.    An order awarding PharmaEssentia its costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

f.    Such other and further relief as the Court deems just and proper.

Dated: November 27, 2024

Respectfully submitted,

*/s/ Andrew D. Prins*
Andrew D. Prins (DC Bar No. 998490)
Christopher H. Schott (DC Bar No. 502523)
Daniel Machado (DC Bar No. 1766981)
Delia Tasky (DC Bar No. 1724285)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email:   andrew.prins@lw.com
         chris.schott@lw.com
         danny.machado@lw.com
         delia.tasky@lw.com

Nicholas L. Schlossman (DC Bar No. 1029362)
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel:  (737) 910-7300
Fax:  (737) 910-7301
Email:   nicholas.schlossman@lw.com

Amelia G. Raether (*pro hac vice pending*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 993-9767
Email:   amelia.raether@lw.com

Emma Dougall (*pro hac vice pending*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
Email:   emma.dougall@lw.com

*Attorneys for Plaintiff PharmaEssentia USA Corporation*