**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**PHARMAESSENTIA USA CORP.**,

        Plaintiff,

        v.

**DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,**

        Defendants.

Case No. 1:24-cv-03346 (TNM)

---

**<u>MEMORANDUM OPINION</u>**

PharmaEssentia USA, a drug manufacturer, challenges the Centers for Medicare and Medicaid Services' (CMS) conclusion that it did not qualify as a "Specified Small Manufacturer." That decision denied PharmaEssentia the ability to gradually phase in drug discounts the Inflation Reduction Act (IRA) mandates.

The governing statutory scheme is complex, but the dispute is not. The parties agree that PharmaEssentia satisfied all but one of the statutory requirements for a "Specified Small Manufacturer." Further, whether PharmaEssentia satisfied that requirement turned on whether there were any "costs" incurred because of qualifying dispenses of its drug in 2021. According to CMS's records, no such "costs" existed. CMS accordingly denied PharmaEssentia's eligibility request. PharmaEssentia, however, maintains that it made three qualifying drug sales in 2021 and repeatedly offered evidence of those sales to the agency. CMS denied those reconsideration requests, pointing to the lack of evidence in its own records.

This Court's review of the dispute is narrow. Under the APA, it considers only whether CMS properly applied the governing law and whether it acted arbitrarily and capriciously in

1

deciding that PharmaEssentia was not eligible for its desired phase-in status. Taking these questions in turn, the Court first rejects CMS's reading of the governing statutes. The Court then holds that CMS acted arbitrarily and capriciously in making its determination. CMS failed to acknowledge PharmaEssentia's evidence that it had qualifying drug dispenses. The Court will vacate and remand the decision to CMS.

## I.

The Court begins with a brief explanation of the relevant Medicare framework. Then, the Court recounts how this framework affected PharmaEssentia.

## A.

Medicare is a federally funded and administered health insurance program for eligible elderly and disabled individuals. *See* 42 U.S.C. §§ 1395 *et seq.* "It is administered by CMS, a component of the U.S. Department of Health and Human Services." *Servier Pharms. LLC v. Becerra*, No. CV 24-2664, 2025 WL 27352, at *1 (D.D.C. Jan. 3, 2025).

This case concerns Medicare "Part D," which governs outpatient prescription drug coverage. "Under Part D, qualified Medicare beneficiaries may enroll in a variety of Part D plans, administered by private insurance companies, that contract with CMS to provide coverage for drugs that have been identified by the Medicare statute as 'covered part D drugs.'" *Servier Pharms.*, 2025 WL 27352, at *1 (cleaned up); *see* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, § 101(a), 117 Stat. 2066, 2071–2072 (2006) (codified as amended in scattered sections of Title 42 of the U.S. Code). When Congress introduced Medicare Part D in 2003, it allocated drug costs between beneficiaries, insurance companies, and drug manufacturers.[1]

---

[1] Part D benefits can be provided by various entities; the Court refers to them collectively as "Part D plans" or "Part D sponsors." *See* 42 C.F.R. § 423.4 (defining a "Part D plan sponsor").

From the start, Medicare Part D had four "layers" of coverage. 42 U.S.C. § 1395w-102(b) (2006). At first, the beneficiary was responsible for all prescription costs. *Id.* § 1395w-102(b)(2) (2006). Once the beneficiary met a deductible, the "coverage" layer kicked in and the insurance company began contributing. *Id.* § 1395w-102(b)(2), (b)(3) (2006). But when the beneficiary's annual drug costs reached the "initial coverage limit," the beneficiary encountered the "donut hole." *Id.* § 1395w-102(b)(2), (b)(3) (2006). At that point, a beneficiary had to pay a significant percentage of drug costs until he reached the "annual out-of-pocket threshold" and triggered the "catastrophic coverage" phase. *Id.* § 1395w-102(b)(4) (2006). Under that final layer, the government covered 80% of the cost of the drug, leaving the remaining amount shared between the Part D plan and the beneficiary. *Id.* § 1395w-115(b)(1) (2006).

Congress operationalized the government's subsidization obligations by requiring the Secretary of Health and Human Services to pay a "reinsurance payment amount" to Part D plans. *See* 42 U.S.C. § 1395w-115(a)(2) (2006). That amount represented "80 percent of the allowable reinsurance costs . . . attributable to that portion of gross covered prescription drug costs . . . incurred in the coverage year after [a Part D beneficiary] has incurred costs that exceed the annual out-of-pocket threshold." *Id.* § 1395w-115(b)(1) (2006). The statute defines "gross covered prescription drug costs" as most "costs incurred under the plan." *Id.* § 1395w-115(b)(3) (2006). The statute defines "allowable reinsurance costs" as "the part of such costs that are actually paid . . . by the sponsor or organization or by (or on behalf of)" a beneficiary. *Id.* § 1395(b)(2) (2006). At a high level, Congress ordered the Secretary to pay Part D plans an annual percentage of the total costs the plan incurred on behalf of a particular beneficiary.

Congress gave the Secretary discretion to determine how to pay the Part D plans. 42 U.S.C. § 1395w-115(d)(1) (2006) ("Payments under this section shall be based on such a method

3

as the Secretary determines.").  And Congress "conditioned" Part D plans' payment on their "furnishing to the Secretary, in a form and manner specified by the Secretary, of such information as may be required to carry out this section."  *Id.* § 1395w-115(d)(2)(A) (2006).  The Secretary delegated his responsibilities to CMS.  *See* Defs.' Cross Mot. for Summ. J. ("Defs.' Mot.") at 7–8, ECF No. 23-1.  CMS used that statutory discretion to promulgate rules specifying the information that Plan D plans must provide to receive payment.

Most importantly, CMS established a system "for cataloguing prescription drug event (PDE) records" to help ascertain the amount due to Part D plans.  *See generally* 70 Fed. Reg. 58,436 (Oct. 6, 2005).  "'Every time a beneficiary fills a prescription covered under Part D,' CMS explained, 'plans must submit a summary record called the prescription drug event (PDE) record to CMS.'"  Defs.' Mot. at 9 (quoting 70 Fed. Reg. at 58,437).  PDEs do not show "the actual claim paid at the pharmacy."  *Id.* at 10 (quoting Pl.'s Ex. 2 at 12, ECF No. 22-3).[2]  Instead, each data point is a record of the claim created by the Part D plan.  *Id.* (quoting Pl.'s Ex. 2 at 12).  "The PDE record contains prescription drug cost and payment data" that allow CMS to determine the amount due to Part D plans.  *Id.* (quoting 70 Fed. Reg. at 58,437).  Medicare and its coverage layers have evolved over the past two decades, and CMS has looked to the PDE system as a mechanism for implementing these reforms.  *See* Defs.' Mot. at 10–11.

This case concerns the Inflation Reduction Act's (IRA) reforms to Part D in 2022.  Pub. L. No. 117-169, 136 Stat. 1818 (2022).  One such reform was the elimination of the "donut hole" coverage gap.  *See* Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") at 8, ECF No. 22; Defs.' Mot. at 12; Administrative Record ("A.R.") 19, ECF No. 28.  The IRA closes that gap by requiring drug

---

[2]  The Court takes judicial notice of this publicly available document produced by CMS for background purposes. *See* Fed. R. Evid. 201(b)(2), (d); *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33–34 (D.D.C. 2014).

manufacturers to pay costs previously borne by beneficiaries and Plan D plans. *See* 42 U.S.C. § 1395w-114c(g)(4)(A). Not all manufacturers had to immediately assume these costs. Two categories of manufacturers can phase in their discount obligations. *Id.* § 1395w-114c(g)(4).

The first category of phase-in eligibility is for "Specified Manufacturers." 42 U.S.C. § 1395w-114c(g)(4)(B). A Specified Manufacturer is "a manufacturer of an applicable drug" that meets three qualifications not relevant here. *Id.* § 1395w-114c(g)(4)(B)(ii)(I)(aa)–(cc). It is undisputed that PharmaEssentia qualifies as a Specified Manufacturer. *See* Defs.' Mot. at 14, A.R. 104–107. Specified Manufacturers can phase in their discount obligations for drugs dispensed to certain beneficiaries. They must otherwise provide the full discounts required. 42 U.S.C. § 1395w-114c(g)(4)(B)(iii).

The second category of phase-in eligible manufacturers—"Specified Small Manufacturers"—can phase in their discounts for all Part D beneficiaries. 42 U.S.C. § 1395w-114c(g)(4)(C)(i), (g)(4)(C)(iii). To qualify as a Specified Small Manufacturer, a manufacturer must qualify as a Specified Manufacturer. More, they must have a drug that accounted for 80% or more of "the total expenditures" for all of that manufacturer's drugs under Part D in 2021.[3] *Id.* § 1395w-114c(g)(4)(C)(ii)(I). "[T]he term 'total expenditures' includes, in the case of expenditures with respect to part D, the total gross covered prescription drug costs as defined in section 1395w-115(b)(3) of this title." *Id.* § 1395w-114c(g)(4)(D). Section 1395w-115(b)(3), in turn, is the definition of "gross covered prescription drug costs."

---

[3] In full, the second requirement reads: "the total expenditures under part D for any one of the specified small manufacturer drugs of the manufacturer that are covered by the agreement or agreements under section 1395w-114a of this title of such manufacturer for such year and covered under this part during such year are equal to or more than 80 percent of the total expenditures under this part for all specified small manufacturer drugs of the manufacturer that are covered by such agreement or agreements for such year and covered under this part during such year." 42 U.S.C. § 1395w–114c(g)(4)(C)(ii)(I)(bb).

Again, Congress delegated authority for implementing the IRA's discount requirements to CMS, via the Secretary. *See* A.R. 1 (citing IRA § 11201(f), 136 Stat. at 1883). In November 2023, CMS produced two guidance documents that laid out how manufacturers could get a phase-in eligibility determination. A.R. 28–29, 57–58. CMS would rely on PDEs to determine "total expenditures" for purposes of Specified Small Manufacturer eligibility. A.R. 59–63. Once CMS issued its decision, a manufacturer would have 30 days to submit a recalculation request. A.R. 29. The recalculation decision would be "final and binding." A.R. 29.

### B.

This case concerns CMS's determination that PharmaEssentia was not a Specified Small Manufacturer. PharmaEssentia makes a single drug in the United States—BESREMi, a medication that treats a rare form of blood cancer. Pl.'s Mot. at 17. The only dispute in the underlying regulatory proceedings was whether PharmaEssentia satisfied the second requirement for Specified Small Manufacturer status. Did a single drug account for 80% or more of the "total expenditures" for PharmaEssentia's 2021 Part D drug dispenses? *See* Defs.' Mot. at 13–14; Pl.'s Reply in Supp. Mot. for Summ. J. ("Pl.'s Reply") at 8 n.3, ECF No. 26.

PharmaEssentia submitted a timely application for IRA discount phase-ins. *See* A.R. 104. CMS responded with a non-binding, preliminary determination. A.R. 104–106. That decision found that PharmaEssentia was not a Specified Small Manufacturer because there were no Part D expenditures for its drugs in 2021. A.R. 105–106. Recall that a Specified Small Manufacturer is a Specified Manufacturer with 80% of its total 2021 Part D expenditures coming

6

from one drug.  *See* 42 U.S.C. § 1395w–114c(g)(4)(C)(ii)(I).  A manufacturer with no 2021 Part D expenditures would, of course, not qualify.

In April 2024, CMS issued a final eligibility determination reiterating its conclusion that PharmaEssentia was a Specified Manufacturer, but not a Specified Small Manufacturer.  A.R. 107.  That decision clarified that CMS relied on PDEs and that the decision was "contingent upon the accuracy" of the information before it.  A.R. 107.  Consistent with CMS's instructions, the decision advised that PharmaEssentia could submit a recalculation request within 30 days accompanied by "any relevant supporting information."  A.R. 107.

PharmaEssentia submitted a timely recalculation request.  A.R. 110–112.  It disagreed with CMS's conclusion that it was not a Specified Small Manufacturer because it "did not have any sales of product in 2021" that could "satisfy the '80 percent of total expenditures' test." A.R. 111.  PharmaEssentia explained that it "had Part D sales of its drug, BESREMi®, in 2021," and those sales accounted for more than 80% of its total expenditures.  A.R. 111.  Indeed, PharmaEssentia noted, those sales accounted for all the 2021 expenditures for its drugs because "BESREMi® is PharmaEssentia's only marketed product."  A.R. 111.  PharmaEssentia included a chart showing three BESREMi dispenses in December 2021.  A.R. 111.  That data came from the pharmacy that had dispensed the drugs.  A.R. 111.  PharmaEssentia told CMS that it believed "there should be a corresponding PDE report for the 2021 Plan year related to the drug reimbursement submitted but whether or not the Part D Plan correctly submitted its PDE reports, the dispensing event and Part D reimbursement clearly happened in 2021."  A.R. 111–112.

CMS responded to the recalculation request in June 2024, maintaining its position that PharmaEssentia did not qualify as a Specified Small Manufacturer.  A.R. 113–116.  CMS's letter referenced its prior guidance indicating that it would use PDEs to calculate expenditures.  A.R.

114–115.  "CMS conducted additional data reviews, but again determined that there are no final action, non-delete PDEs with 2021 dates of service for any applicable drug" made by PharmaEssentia.  A.R. 115.  "Because PharmaEssentia had no 2021 Part D expenditures for all of its applicable drugs," CMS concluded, "no applicable drug had 2021 Part D expenditures totaling 80 percent or more of the total 2021 Part D expenditures."  A.R. 115.  CMS did not mention PharmaEssentia's evidence.

Two months later, PharmaEssentia asked CMS for a meeting to share "additional evidence" of qualifying drug sales in 2021.  A.R. 117; *see* A.R. 127 (subsequent request).  CMS ultimately agreed, and the parties met in October 2024 by videoconference.  *See* A.R. 125–126, 166.[4]  PharmaEssentia presented the same table from its recalculation request showing the dispenses recorded by its pharmacy, alongside other evidence that the three dispenses occurred in 2021 and were paid for by a Part D plan.  A.R. 146–162.  PharmaEssentia again maintained that CMS had to consider this evidence notwithstanding the lack of PDE documentation.  AR 146.

Two weeks later, CMS advised PharmaEssentia that it "was making no change" to its eligibility determination.  A.R. 167.  CMS reiterated that it relied on PDEs to determine PharmaEssentia's "Part D total expenditures for 2021."  A.R. 167.  This time, the agency acknowledged PharmaEssentia's data.  CMS told PharmaEssentia:  "We appreciate hearing your perspective that data supplied by a contracted specialty pharmacy regarding three dispenses of BESREMi are potentially relevant to whether there were Part D total expenditures for BESREMi in 2021."  A.R. 167.  "[H]owever," CMS continued, "this information does not evidence Part D total expenditures consistent with [42 U.S.C. § 1395w-114c]."  A.R. 167.  "Because there are no

---

[4]  The meeting is documented by two slide decks.  A.R. 132–166, 176–216.  The first deck is the version sent to CMS before the meeting and the second deck is the version PharmaEssentia used during the meeting.  Defs.' Mot. at 23 & n.3.  Because the parties agree that the presentations are "substantially similar" and do not point to any material differences, the Court treats them as interchangeable.  *See id.* at 23.

. . . PDEs with 2021 dates of service for any applicable drug under PharmaEssentia's FDA-assigned labeler code, CMS is making no change to the phase-in eligibility determination sent to PharmaEssentia on April 4, 2024." A.R. 167.

After receiving CMS's decision, PharmaEssentia sued the Department of Health and Human Services, CMS, and both the Secretary and the Administrator of CMS in their official capacities (collectively, "CMS"). Compl. ¶¶ 42–45, ECF No. 1. PharmaEssentia's Complaint includes two claims, both alleging violations of 5 U.S.C. § 706. First, CMS acted contrary to Section 1395w-114c in refusing to consider "costs" incurred by Part D plans for BESREMi dispenses. Compl. ¶¶ 191–200. Second, CMS's decision to rely exclusively on PDEs, without considering PharmaEssentia's evidence, was arbitrary and capricious. Compl. ¶¶ 201–214. The parties cross-moved for summary judgment. These motions are ripe. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

## II.

Summary judgment is normally appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But this standard does not apply when a court reviews a decision by an administrative agency under the APA. *See, e.g.*, *Remmie v. Mabus*, 898 F. Supp. 2d 108, 115 (D.D.C. 2012). Instead, "the district judge sits as an appellate tribunal" and the "entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (cleaned up).

"In informal adjudications," like this one, "agencies must satisfy only minimal procedural requirements." *Sw. Airlines Co. v. TSA*, 650 F.3d 752, 757 (D.C. Cir. 2011). But an informal adjudication "still must comply with the familiar APA standard banning arbitrary and capricious

actions." *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017).  Courts must "hold unlawful

and set aside" a decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).

## III.

The Court begins with CMS's threshold objection that PharmaEssentia failed to exhaust

its arguments.  Defs.' Mot. at 33–39.  "A party challenging agency action generally must first

raise an issue before the agency to preserve it for judicial review."  *Liquid Energy Pipeline Ass'n*

*v. FERC*, 109 F.4th 543, 546–547 (D.C. Cir. 2024).  PharmaEssentia told CMS that it could not

exclusively rely on PDEs when presented with other evidence of expenditures.  But the company

did not broadly challenge PDE reliability.  So the former argument is exhausted and the latter is

not.

PharmaEssentia asserted at least twice before CMS that the agency needed to consider

non-PDE evidence of "total expenditures" because the statute does not limit "expenditures" to

those reflected in PDEs.  *See* Pl.'s Mot. at 28–34.  In its recalculation request, PharmaEssentia

provided evidence that its drug had been dispensed in 2021.  And it argued, "there should be a

corresponding PDE report for the 2021 Plan year related to the drug reimbursement submitted

*but whether or not the Part D Plan correctly submitted its PDE reports,* the dispensing event and

Part D reimbursement clearly happened in 2021."  A.R. 111–112 (emphasis added).  In other

words, PharmaEssentia maintained that it did not matter whether PDEs documented

"expenditures" because it had alternative evidence of expenditures.

PharmaEssentia elaborated this argument in its presentation.  It told CMS:  "The statute

does not require CMS to use PDE data as the sole data source" when calculating "total

expenditures."  A.R. 146.  CMS protests that PharmaEssentia has expanded its statutory

arguments. *See* Defs.' Mot. at 37. True, but an argument is preserved "if the agency reasonably should have understood the full extent of [the plaintiff's] argument." *Haselwander v. McHugh*, 774 F.3d 990, 997 (D.C. Cir. 2014) (cleaned up). It is hard to see how PharmaEssentia could have made this argument more clearly than it did, particularly given the informality of the agency's proceedings. PharmaEssentia quoted the definitions of "total expenditures" and "gross covered prescription drug costs"—the same text it relies on now. *Compare* A.R. 143 *with* Pl.'s Mot. at 28–34. And were there any doubt about why PharmaEssentia cited these definitions, another slide explained: "To the extent that a statutory 'total expenditure' is not reflected on the PDE record, but is supported by other documentation, it is inappropriate for CMS to rely solely on PDE data." A.R. 146; *see* A.R. 168 (email from PharmaEssentia's counsel to CMS reiterating this argument). CMS "should have understood" PharmaEssentia's argument. *Haselwander*, 774 F.3d at 997.

The same is not true of PharmaEssentia's broader argument about PDE unreliability. *See* Pl.'s Mot. at 35–38; Defs.' Mot. at 35–37. PharmaEssentia levies several attacks at CMS's chosen data source. It says that PDEs are ill-suited to making manufacturer-side determinations because Part D plans that may lack incentives to properly report all drug transactions. Pl.'s Mot. at 35, 36. PharmaEssentia is also concerned that CMS did not solicit comments on its decision to rely on PDEs and did not provide "mechanisms to remediate flawed PDE data." *Id.* at 37–38.

PharmaEssentia did not raise these concerns before CMS. Instead, it proceeded on the assumption that CMS could rely on PDEs so long as CMS considered a manufacturer's other evidence. *See, e.g.*, A.R. 111, 139, 146. The closest PharmaEssentia came to arguing that CMS could not rely on PDEs at all was its statement that "CMS has recognized that errors may exist in the PDE data sample." A.R. 146 (cleaned up). But PharmaEssentia offered that argument only

in support of its point that it was "inappropriate for CMS to rely solely on PDE data" when there

was other evidence of a "statutory 'total expenditure.'" A.R. 146. Another clue to the delta

between PharmaEssentia's arguments before the agency and its present arguments is that

PharmaEssentia relies almost exclusively on extra-record exhibits to support its broader attack on

the unreliability of PDE data. *See* Pl.'s Mot. at 35–38.[5] Because PharmaEssentia did not "raise

the[se] issues before the agency during the administrative process," the Court does not consider

them. *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136,

1148 (D.C. Cir. 2005).

In sum, PharmaEssentia argued before the agency that CMS could not rely on PDEs

*alone*. It did not argue that relying on PDEs *at all* was improper. The Court thus considers only

whether CMS may exclusively rely on PDEs while ignoring all other evidence of "expenditures."

## IV.

Now consider the merits of PharmaEssentia's argument that CMS improperly ignored

evidence of "total expenditures" for its drug, BESREMi. PharmaEssentia's argument proceeds

in two steps. *See* Compl. ¶¶ 191–200, 201–214. First, it argues that CMS's Specified Small

Manufacturer determination was "contrary to law" because CMS impermissibly limited

"Congress's chosen definition of 'total expenditures.'" Compl. ¶ 197. Second, PharmaEssentia

maintains that CMS's decision to ignore its evidence was arbitrary and capricious because

---

[5] The Court has not considered this extra-record evidence unless it is properly subject to judicial notice, as noted above. Ordinarily in APA cases, a court reviews only the administrative record. *See Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). PharmaEssentia has not made an adequate showing to invoke one of the rare exceptions to this rule. Rather than moving to supplement the record with explanation for the cause, PharmaEssentia addressed the propriety of the new exhibits for the first time in its reply brief. Pl.'s Reply at 24. The single paragraph PharmaEssentia devotes to arguing that its exhibits are properly before the Court seemingly invokes the principle that "upon clear evidence that the agency's designated record is not accurate and complete, a court may supplement the administrative record." *Cnty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 72 (D.D.C. 2008). But that exception applies only if PharmaEssentia shows that the evidence was both "relevant" and before the agency. *See id.*; *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010). PharmaEssentia has not even tried to make that second showing.

agencies are required to consider the "entire record," including evidence undermining the agency's conclusion.  Compl. ¶¶ 203–204.  CMS counters that both questions are subsumed into a different inquiry—whether CMS abused its discretion by refusing to depart from its bright-line rule of exclusively relying on PDEs to determine "total expenditures."  Defs.' Mot. at 29–32.

The Court disagrees with CMS's framing.  And the Court finds that the definition of "total expenditures" is not as limited as CMS maintains.  For that reason, CMS acted arbitrarily and capriciously in refusing to address the non-PDE evidence before it.

## A.

Because the parties dispute whether CMS's exclusive reliance on PDEs to determine "total expenditures" is authorized by statute, the Court begins by "determining the meaning of [the] statutory provisions" at issue.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024).  "This judicial inquiry includes a determination as to whether the statute in question delegates discretionary authority to the agency and whether the agency engaged in reasoned decisionmaking within the boundaries of that statutory delegation."  *Vanda Pharms., Inc. v. FDA*, 123 F.4th 513, 521 (D.C. Cir. 2024) (cleaned up).

To begin, CMS argues that "[t]his whole action"—including PharmaEssentia's statutory claim—"is properly viewed through the lens of case law addressing instances in which a party asks an agency to waive application of a generally applicable agency rule and the agency declines to do so."  Defs.' Mot. at 29.  Although CMS concedes that it did not describe PharmaEssentia's request as a "waiver," it maintains that its exclusive reliance on PDEs was effectively a decision denying a waiver.  *See* Defs.' Reply in Supp. Cross-Mot. for Summ. J. ("Defs.' Reply") at 5, ECF No. 27.  So, CMS says, the operative question is whether the "reasons for declining to grant the waiver were so insubstantial as to render that denial an abuse of

discretion."  Defs.' Mot. at 29 (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see id.* at 29–30 (discussing *Universal City Studios LLLP v. Peters*, 402 F.3d 1238, 1242 (D.C. Cir. 2005)).  Not so.

CMS's own waiver cases reveal that the Court cannot skip the question of whether the agency acted in accordance with law.  CMS first relies on *Universal City Studios*, where two film studios challenged the Copyright Office's decision that their claims were untimely under the Office's regulations because the claims were neither received nor postmarked in July.  402 F.3d at 1240–1241.  The D.C. Circuit first considered the argument that the Office incorrectly applied its own regulations.  *Id.* at 1241–1242.  Nothing reveals that the court departed from normal administrative law principles in evaluating that argument.[6]  *Cf.* Defs.' Reply at 3–4 (arguing that the only relevant question when reviewing the denial of a waiver is whether the agency abused its discretion).  Only *after* concluding that the Office had properly interpreted the regulations, did the court turn to the studios' claims that the Office abused its discretion by refusing to waive the timeliness requirements in their cases.  *Universal City Studios*, 402 F.3d at 1242.  The same is true of *BellSouth Corp.*  There, the D.C. Circuit first determined whether the challenged rule setting a 45 MHz spectrum cap on commercial radio services was impermissibly overbroad.  162 F.3d at 1222–1224.  After rejecting that challenge, the court then considered whether the agency abused its discretion by denying a "waiver of the spectrum cap" in that case.  *Id.* at 1224.

Of course, this must be true.  Otherwise, an agency could "save an irrational rule by tacking on a waiver procedure."  *ALLTEL Cop. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988); *see*

---

[6] The Circuit did afford the Office's interpretation of its regulations "substantial deference."  402 F.3d at 1241.  But the Office was not entitled to that deference because it denied a requested waiver.  Then-binding precedent instead required courts to afford "substantial deference to an agency's interpretation of its own regulations."  *See id.* (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *but cf. Kisor v. Wilkie*, 588 U.S. 558, 573 (2019) (noting the limitations to such deference).

*BellSouth Corp.*, 162 F.3d at 1225 ("Rigid and consistent adherence to a policy will be upheld *if it is valid*.") (emphasis added). Even CMS ultimately recognizes this limitation in the waiver cases. *See* Defs.' Mot. at 4–5. CMS still protests that this case is different because it "involves a concededly valid rule." *Id.* at 4. But PharmaEssentia has repeatedly maintained that the IRA does not permit CMS to look to PDEs as the exclusive metric of "total expenditures." *E.g.*, Pl.'s Mot. at 28–34; Compl. ¶¶ 197–199; A.R. 111–112, 168. CMS disagrees. *See* Defs.' Mot. at 38–39. There is a dispute about whether CMS's interpretation of the statute is valid. Such disputes are not reviewed through the abuse-of-discretion standard just because the agency claims it adhered to a bright-line rule. *See Universal City Studios*, 402 F.3d at 1241–1242.[7]

Accordingly, the Court exercises its "independent judgment in determining the meaning of" the IRA. *Loper Bright*, 603 U.S. at 394. At issue here is the second requirement for Specified Small Manufacturer status. "[T]he total expenditures under part D for any one of the specified small manufacturer drugs of the manufacturer" in 2021 must be "equal to or more than 80 percent of the total expenditures under this part" for all the manufacturer's drugs. 42 U.S.C. § 1395w-114c(g)(4)(C)(ii)(bb). The IRA defines "total expenditures" by cross-referencing the term "gross covered prescription drug costs." *Id.* § 1395w-114c(g)(4)(D). "Gross covered prescription drug costs" are "with respect to a part D eligible individual enrolled in a [qualifying prescription plan], *the costs incurred under the plan*, not including administrative costs, but *including costs directly related to the dispensing of covered part D drugs* during the year and costs relating to the deductible." *Id.* § 1395w-115(b)(3) (emphasis added). "Total expenditures"

---

[7] Even if CMS were correct that the entire case should be reviewed through the abuse-of-discretion lens, the Court would nevertheless conclude that CMS's decision was improper. CMS failed to explain its refusal to consider PharmaEssentia's evidence. *See* Part III.B; *Universal City Studios*, 402 F.3d at 1242 (reviewing the adequacy of the agency's explanation for its decision); *BellSouth Corp.*, 162 F.3d at 1224 (same); *cf. Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009) ("Arbitrary, capricious, or an abuse of discretion review under § 706(2)(A) is now routinely applied by the courts as one standard under the heading of 'arbitrary and capricious' review.") (cleaned up). That is enough to require remand here.

and "gross covered prescription drug costs" are thus synonyms that refer to the "costs incurred under" a Part D plan. *See* Pl.'s Mot. at 30.

The key word here is "costs." That word means "[t]he amount paid or charged for something; price or expenditure." *Sinclair Wyo. Ref. Co. v. EPA*, 114 F.4th 693, 707 (D.C. Cir. 2024) (quoting Cost, Black's Law Dictionary (11th ed. 2019)). But the statute does not include all "expenditures" associated with a Part D eligible drug. The relevant costs are those incurred "with respect to a part D individual" enrolled in a Part D plan "under" that plan that are "directly related to the dispensing" of the covered drug—costs paid by the plan to the dispensing pharmacy—and "costs relating to the deductible"—those paid by the beneficiary. 42 U.S.C. § 1395w-115(b)(3); *see* Defs.' Mot. at 38 (emphasizing that the definition is "individual-specific"). In other words, "total expenditures" refers to the amount paid by a plan or beneficiary for a particular drug for a particular Part D beneficiary.

CMS does not seriously dispute this analysis, arguing instead that it is incomplete. *See* Defs.' Mot. at 37–39. The agency maintains that the statute gives it the power to narrow the meaning of the phrase "costs incurred under the [plan]" to mean only those costs reflected in PDEs. *Id.* at 39; Defs.' Reply at 13–14. But this argument fails to differentiate between "costs" and "payment amounts." The statute affords CMS discretion to determine the evidence used to calculate only the second category. *See* 42 U.S.C. § 1395w-115(d)(1), (d)(2)(A).

CMS says that the term "gross covered prescription drug costs" must be read in the "context" of the fact that the term was enacted to determine whether a Part D plan was entitled to a "reinsurance payment amount." Defs.' Mot at 39; *see* 42 U.S.C. § 1395w-115(b). Recall that the "reinsurance payment amount" is part of the subsidy the government pays Part D plans to help reduce prescription costs. 42 U.S.C. § 1395w-115(a)–(b). And, CMS points out, Congress

16

gave it discretion to determine how to carry out such payments. *See id.* § 1395w-115(d)(1), (d)(2)(A). CMS conditioned a Part D plan's right to receive the "reinsurance payment amount" on "timely submission of a PDE record." 42 C.F.R. § 423.343(c); *see* 42 U.S.C. § 1395w-115(d)(2)(A). The argument goes that because CMS can determine how plans prove the "reinsurance payment amount," it can also determine how to calculate "gross covered prescription drug costs" and its statutory synonym, "total expenditures." Defs.' Mot. at 37–39; Defs.' Reply at 14. Under that view, "a cost is not incurred within the meaning of [Section] 1395w-115(b)(3) unless and until a Part D plan timely submits a PDE record to CMS" for the drug dispense. *Id.* at 39.

That argument proves too much. CMS conflates "gross covered prescription drug costs" with the "reinsurance payment amount." "Gross covered prescription drug costs" refers to costs paid by Part D plans or beneficiaries to the pharmacy. *See* Pl.'s Reply at 8–13. The "reinsurance payment amount" is the portion of that cost the government pays a plan. *See id.* And it is a plan's right to the "reinsurance payment amount" from the government that is conditioned on compliance with CMS's rules, not whether a beneficiary's or Part D plan's expenditure qualifies as a "gross covered prescription drug cost." 42 U.S.C. § 1395w-115(d)(1). The statute gives CMS discretion to determine "*payments*" made to Part D plans, not to determine "costs" paid by consumers and Part D plans to pharmacies. *See id.* Indeed, it would make no sense to say that CMS could make a "gross covered prescription drug cost[]" contingent on compliance with agency rules because the term includes money paid to pharmacies. *See id.* § 1395w-115(b)(3). That payment flow preexists CMS's involvement at any reimbursement stage. Pl.'s Reply at 9–11.

More, the IRA's definition of "total expenditures" cross-references only the provision of Section 1395w-115 defining "gross covered prescription drug costs," not the broader subsection addressing the calculation of the "reinsurance payment amount" or the provisions conferring discretion on the agency. *See* IRA § 1191(c)(5), 136 Stat. at 1835 (codified at 42 U.S.C. § 1395w-114c(g)(4)(D)); 42 U.S.C. § 1395w-115(b)(3). In short, there is no textual indication that the IRA's definition of "total expenditures"—a measure of *"costs"*—incorporates the discretion Congress gave CMS to carry out *"payments."* The Court therefore rejects CMS's argument that a cost is only "incurred" if documented in PDEs. And that conclusion forecloses CMS's argument that the definition of "total expenditures" permitted CMS to rely exclusively on PDEs. Defs.' Mot. at 38.

**B.**

Having "fix[ed] the boundaries of th[e agency's] delegated authority," the Court now "ensur[es] the agency has engaged in reasoned decisionmaking within those boundaries." *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 766 n.5 (D.C. Cir. 2025) (cleaned up). CMS has not done so. The Court concludes that CMS acted arbitrarily in refusing to address PharmaEssentia's evidence of "total expenditures."

Two related principles frame the Court's analysis. First, an agency acts arbitrarily and capriciously when it "refus[es] to consider evidence bearing on the issue before it" or ignores "evidence contradicting its position." *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). This requirement of "[r]easoned decisionmaking is not a procedural requirement" but "stems directly from § 706 of the APA." *Id.* at 195. Second, "[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). "[T]he agency is not required to

author an essay for the disposition of each application. It suffices, in the usual case, that we can discern the why and wherefore." *BellSouth Corp.*, 162 F.3d at 1224 (cleaned up).

The "why and wherefore" of CMS's decision are unclear. In its recalculation request, PharmaEssentia presented evidence that there had been "total expenditures" for its drug in 2021 and argued that "whether or not the Part D Plan correctly submitted its PDE records, the dispensing event and Part D reimbursement clearly happened in 2021." A.R. 111–112. CMS did not respond to that argument. *See* A.R. 115. Instead, CMS simply reiterated that the PDEs did not document any expenditures. A.R. 115.

PharmaEssentia amplified its argument in its reconsideration request to no avail. PharmaEssentia presented more information about the evidence that it believed showed that there were 2021 "expenditures" for its drug. A.R. 144, 147–162. And it elaborated, "[t]o the extent that a statutory 'total expenditure' is not reflected on the PDE record, but is supported by other documentation, it is inappropriate for CMS to rely solely on PDE data." A.R. 146; *see* A.R. 139 (making the same argument). CMS once again responded that PharmaEssentia was not a Specified Small Manufacturer because there are no "PDEs with 2021 dates of service" for PharmaEssentia's drug. A.R. 167. This decision did acknowledge PharmaEssentia's "perspective that data supplied by a contracted specialty pharmacy regarding three dispenses of BESREMI are potentially relevant to whether there were Part D total expenditures." A.R. 167.

Still, this was insufficient. The very point of PharmaEssentia's submission was that non-PDE data showed costs relevant to the "total expenditures" calculation. Yet CMS swept the evidence aside, merely citing the statute. A.R. 167. The agency's "refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706."

19

*Butte Cnty.*, 613 F.3d at 194; *see also, e.g.*, *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015).

CMS's first defense of its response returns to its argument that its refusal to consider the non-PDE evidence was effectively a decision declining to waive its rule that "total expenditures" are exclusively based on PDEs.  Defs.' Mot. at 31.  To be sure, "[a]n agency's strict construction of a general rule in the face of waiver requests is insufficient evidence of abuse of discretion." *Universal City Studios*, 402 F.3d at 1242.  But CMS never described itself as considering a waiver request.  *See* A.R. 107, 114–115, 167.  The Court is therefore reluctant to see CMS's refusal to consider PharmaEssentia's evidence as deliberate.  After all, in CMS's waiver cases, the agencies made clear that they were applying an existing bright-line rule.  *See BellSouth Corp.*, 162 F.3d at 1220–1221; *Universal City Studios*, 402 F.3d at 1242–1243.

True, an agency is not rigidly tied to the specific words it used in the administrative process.  Nothing prohibits an agency "from submitting an amplified articulation of the distinctions it sees."  *Concert Inv., LLC v. SBA*, 100 F.4th 215, 220 (D.C. Cir. 2024).  But CMS is not merely "amplifying" its prior statement.  It is asking the Court to "guess" that the reason for its decision was that it refused to waive a bright-line policy.  *See Farrell v. Blinken*, 4 F.4th 124, 137 (D.C. Cir. 2021).

CMS's refusal to consider PharmaEssentia's evidence is particularly surprising on this record because CMS seemingly invited that evidentiary proffer.  CMS's original decision said that it was "contingent upon the accuracy" of "the information available at the time of the review" and "could change if CMS learns that the information relied on is not accurate."  A.R. 107.  And CMS claims that it "imposed no limits whatsoever on what a manufacturer could submit in support of its recalculation request."  Defs.' Reply at 9; *see* A.R. 29 (manufacturers

could include "any relevant supporting information" as part of a recalculation request). Yet CMS ignored evidence it says PharmaEssentia was free to submit. That apparent doublespeak is the sort of arbitrariness Section 706 guards against. *See Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018) ("Of course, it would be arbitrary and capricious for the agency's decision making to be internally inconsistent.") (cleaned up); *cf. Green Country Mobilephone, Inc. v. FCC*, 765 F.2d 235, 237 (D.C. Cir. 1985) (finding FCC's failure to grant a waiver from a rule denying late filings arbitrary and capricious where FCC "invoked the rule inconsistently").

CMS now offers several other explanations for its decision based on the details of PharmaEssentia's evidence. CMS questions the data's reliability, Defs.' Mot. at 30–31, and criticizes PharmaEssentia's tardiness in submitting the evidence, *id.* at 32–33. The agency also maintains that the data is inadequate because it does not identify who received each dispense. *Id.* at 38–39. One or more of these reasons may justify the agency's conclusion that PharmaEssentia is not a Specified Small Manufacturer. But courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–286 (1974). And nothing in the record shows that CMS acknowledged PharmaEssentia's evidence, let alone gestured at reliability concerns. Because the administrative record lacks any statement from which CMS's new arguments could "reasonably be discerned," *id.*, the Court cannot rely on them here.

Without any discernable explanation for CMS's refusal to address PharmaEssentia's evidence, the Court concludes that CMS acted arbitrarily and capriciously. *See Butte Cnty.*, 613 F.3d at 194.

**V.**

Having concluded that CMS violated Section 706 by disregarding PharmaEssentia's evidence of "total expenditures" for its drug, the Court vacates CMS's determination and remands to the agency.  *See* 5 U.S.C. § 706(2); *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) ("Vacatur is the normal remedy under the APA").  CMS may well come to the same conclusion, but it must do so within the guardrails of Section 706.

For these reasons, Plaintiff's Motion for Summary Judgment, ECF No. 22, will be granted, and Defendants' Cross-Motion for Summary Judgment, ECF No. 23, will be denied. The case will be remanded for further proceedings consistent with this opinion.  An appropriate Order will issue today.[8]

_____

Dated: September 29, 2025                     TREVOR N. McFADDEN, U.S.D.J.

_____

[8] The Court finds that a motion hearing here is unnecessary and thus denies PharmaEssentia's request for one.